UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

STEPHEN GANSTINE,

      **Plaintiff,**

v.                                **CASE NO. 4:11cv88-RH/WCS**

EDWIN BUSS, etc., et al.,

      **Defendants.**

_____/

## PLAINTIFF'S RESPONSE AND MEMORANDUM OF LAW IN RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

      Plaintiff, STEPHEN GANSTINE, through his counsel, hereby files this his Response and Memorandum of Law in Response to Defendants' Motion for Summary Judgment and states:

### I.  PLAINTIFF'S STATEMENT OF DISPUTED MATERIAL FACTS

      1.      Plaintiff suffers from Obstructive Sleep Apnea, Diabetes, crippling gout, chronic back pain, hypertension, heart disease, and is obese. [Exhibit 17 (Plaintiff's affidavit), ¶2].  He suffered from all these conditions during his incarceration within the Department of Corrections ("DOC"), from March 1, 2007 until his release on February 26, 2010. [Id.].  He has received Social Security disability benefits since 1992 and has not held a job since 1992 due to his disabilities. [Id. at ¶3].

      2.      Because of Plaintiff's various medical conditions, walking is very difficult for him and he has  limited his walking over the past twenty years. [Id. at ¶ 4].  Plaintiff can walk around thirty to forty feet without having to stop to rest. [Id.].  He also has balance problems and walks much more slowly than the vast majority of people in society. [Id.].  Plaintiff has been issued a Florida handicapped parking permit every year since 1992. [Id. at ¶5].  To qualify for the permit a

person must be "unable to walk more than one hundred feet without stopping to rest." [Id.]. During Plaintiff's DOC incarceration, when he had no choice but to frequently walk in excess of one hundred feet, his back and buttocks hurt every time.

3.      Plaintiff has suffered from crippling gout since 1978. [Id. at ¶6]. In its acute stages, Plaintiff's gout forms bumps on his ankles, feet, and toes. [Id.]. These areas get inflamed and cause extreme pain. [Id.]. During an acute gout flare-up, Plaintiff does not move around unless absolutely necessary. [Id.]. He even urinates into a jug in lieu of walking to the bathroom. [Id.]. If he must walk when his gout is in its acute stage, he cannot walk more than ten or fifteen feet without stopping to rest. [Id.].

4.      Plaintiff has suffered from Obstructive Sleep Apnea since 1999, when he was diagnosed with the condition. [Id. at ¶7; see also Exhibit 2].]. At that time he was prescribed a Continuous Positive Airway Pressure (CPAP) machine to help curb the deleterious effects of the condition. [Id.]. However, dating back to 1992, even when using a CPAP machine, Plaintiff has suffered from panic attacks as a result of his sleep apnea. [Id.]. Sleep apnea is a sleep disorder that causes sufferers to stop breathing during sleep. [Exhibit 18 (Spedale affidavit), ¶4]. Obstructive sleep apnea is a serious medical condition that constricts Plaintiff's air passageways. [Id.; Exhibit 17 (Plaintiff's affidavit), ¶8]. During Plaintiff's panic attacks, Plaintiff is starved for air and feels like he is drowning. [Id.]. These attacks occur two to three times per week even with the use of the CPAP machine. [Id.]. Even with the machine, Plaintiff gets only three to four hours of quality sleep per night. [Id.].

5.      A CPAP machine is fundamentally necessary for a person who suffers from Obstructive Sleep Apnea. A CPAP machine helps the person breathe more easily during sleep.

[Exhibit 18 (Spedale affidavit), ¶4]. It increases air pressure in Plaintiff's throat so his airway does not collapse. [Id.]. According to Plaintiff's medical history, he is miserable without the aid of his CPAP machine. [See id. at ¶5]. Plaintiff only sleeps a maximum of two to three hours at a time before waking up from his problems with his sleep apnea, his back, or kidney pain or a need to urinate. [Exhibit 17 (Plaintiff's affidavit), ¶8]. It usually then takes Plaintiff a couple hours to get back to sleep, after a panic attack.

6.      Plaintiff also has suffered from chronic and substantial back pain since approximately 2006. [Id. at ¶9]. This pain increased dramatically during his incarceration with DOC. [Id.]. When Plaintiff arrived at DOC on March 2, 2007 he was first housed at Lake Butler Reception Medical Center ("RMC") where he remained for about two months before he was transferred to a more permanent facility. [Id. at ¶10]. From Plaintiff' observation, the average inmate remains at RMC for two or three months until they are moved to a permanent facility. [Id.; see also Exhibit 16 (Sweat deposition), pgs. 37-38 (inmates housed at RMC commonly remain for months before being moved to different facilities)].

7.      Fernando Morales, a physician's assistant, issued Plaintiff a pass for his CPAP machine on March 2, 2007. [Id. at ¶11]. Morales specifically acknowledged on Plaintiff's chart on March 2nd that Plaintiff suffered from gout and sleep apnea and used a CPAP machine. [Exhibit 3; Exhibit 13 (Perez deposition), pgs. 19-21].

8.      Plaintiff was then examined by Defendant Perez on March 6, 2007. [Id. at ¶12]. He told Perez that he had been legally disabled since 1992. [Id.]. Plaintiff told Perez during his examination that he needed a CPAP machine. [Id. at ¶16]. He informed her that he had been on a CPAP machine since 1998 and that he had one at the county jail the night before arriving at RMC.

[Id.].  Plaintiff told Perez he needed a CPAP machine because he was a heart patient and also suffered from severe, chronic sleep apnea. [Id.].  He told her the machine was his number one concern. [Id.].  She said "no CPAP" and did not explain why. [Id.].

9.      Dr. Perez specifically noted in her assessment that Plaintiff suffered from a history of sleep apnea and used a CPAP machine. [Exhibit 13 (Perez deposition), pg 24; Exhibit 4].  Despite the fact that prison doctors are authorized to order CPAP machines for prisoners, [Exhibit 13 (Perez deposition), pg. 9], and RMC had electrical outlets in the dorm rooms. [Exhibit 17 (Plaintiff's affidavit), ¶16], Perez had no explanation for discontinuing Plaintiff's CPAP pass. [Exhibit 13, pgs. 28-29]

10.      The process at DOC for dealing with prisoners like Plaintiff is for the prison doctor to refer a patient who has sleep apnea to the pulmonary clinic or a specialist, if appropriate. [Exhibit 13 (Perez deposition), pg. 11].  Perez did not refer Plaintiff to a pulmonologist for a sleep study nor did she schedule him for chronic illness clinics. [Id. at ¶17].  She gave no indication to Plaintiff that she was waiting on records from any of his physicians to confirm his diagnosis. [Id.].  Indeed, Perez never sought any medical records from Plaintiff's primary care physician. [Exhibit 18 (Spedale affidavit), ¶9].  Perez did not order any follow-up testing within the three months following her examination. [Exhibit 13 (Perez deposition), pg. 31].  Perez delayed Plaintiff's access to a CPAP machine until at least May 22, 2007, which was at least 2 and ½ months from her first examination of Plaintiff, at which time he was tentatively scheduled for a medical clinic appointment. [See Exhibit 9, pg. 1].

11.      Unlike Dr. Perez, after examining Plaintiff on May 1, 2007,  Dr. Maxwell Cline scheduled an appointment for Plaintiff with the pulmonary clinic and requested his previous sleep

4

study results. [Exhibit 9, pg. 1].  DOC's expert, Dinesh Patel, M.D., opined that Perez's decision to defer Plaintiff's treatment for his sleep apnea and his prescription for a CPAP machine was justifiable *if* [and, one could read, "only if"] she "was waiting for records to confirm the diagnosis and treatment recommendations." [Doc 44-2, pg. 5].  Thus, Dr. Patel concluded that Perez subjected Plaintiff to the risk of serious harm by her failure to initiate any CPAP therapy. [Doc 44-2, pg. 5].

12.     Defendant Perez also examined Plaintiff's back during her March 6, 2007 evaluation. [Id.].  Plaintiff told her his back was killing him from walking and standing in lines. [Id.].  Plaintiff's lengthy walk back to his dorm from the exam caused agonizing pain in his hips and knees and left his back throbbing. [Id. at ¶18].  He told Perez he was physically unable to endure the amount of walking and standing that DOC demanded of him. [Id. at ¶13].  Plaintiff made Perez clearly aware of the pain he was enduring by having to get around the complex. [Id. at ¶14].  Every day the pain got worse. [Id.].  Plaintiff even skipped meals to avoid walking. [Id.]. He realized by the time of that examination that he could not continue at DOC without a wheelchair due to the excessive walking and standing. [Id.].  He weighed approximately 265 pounds when he was examined by Perez. [Id.]. Plaintiff told Perez that he needed a wheelchair.  She said no. [Id.].

13.     Perez did not give Plaintiff any reason for the denial of the wheelchair although she noted that he had a hunch back. [Exhibit 13 (Perez deposition, pgs. 22-24].  She observed that Plaintiff suffered from chronic low back pain, endured a compression deformity of two of his vertebrae, and was obese. [Doc 44-3, pg. 5; (Perez deposition), pgs. 22-24].  Plaintiff had, as of May 2007, degenerative joint disease in his lower back. [Exhibit 14 (Christopher deposition), pg. 23]. Plaintiff had also informed Perez that he was prescribed pain medication for his back. [Exhibit 17, ¶12].  Perez refused to provide him with that pain medication as well as Ibuprofen. [Id.].

14.     Plaintiff also requested soft, diabetic shoes. [Id. at ¶15].  Again, Perez said no. [Id.]. Instead of giving a reason, she said to "sit back and shut up." [Id.].  Perez acknowledged that Plaintiff informed her of his history of gout. [Doc 44-3, pg. 5].  Proper foot ware is necessary for diabetics because they very commonly lose feeling in their feet. [Exhibit 17, ¶15].  This causes lack of circulation, which in this case caused Plaintiff's toes to become infected. [Id.].  Plaintiff and Perez discussed for more than an hour his need for a CPAP machine, wheelchair, and diabetic shoes. [Id. at ¶18].

15.     Plaintiff submitted multiple formal and informal grievance requests to DOC for a CPAP machine in March and April of 2007. [Exhibit 9, pg. 1].  He filed a grievance against Dr. Perez on March 7, 2007 requesting a CPAP machine. [Id. at ¶19; Exhibit 5].  His grievance notified DOC that his sleep apnea had lead to him having anxiety attacks in the past,  [Id.].  Plaintiff noted that he had a sleep study done and a CPAP prescribed at that time. [Id.].  His grievance further indicated that he had been using a CPAP machine since that time and that he has suffered from panic attacks since 1992. [Id.].

16.     Pin his grievance, Plaintiff again requested diabetic shoes. [Plaintiff's Exhibit 17 (Plaintiff's affidavit), ¶20; Exhibit 5].  He also filed a grievance asking for a wheelchair.  [Plaintiff's Exhibit 17 (Plaintiff's affidavit), ¶21].  At the time he filed these grievances, wheelchairs and CPAP machines were allowed at the RMC Main Unit. [Id.].

17.     Plaintiff was transferred to RMC's West Unit on March 20, 2007. [Id. at ¶22].  On March 21, 2007, he attended sick call at RMC West. [Id.].  Nurse Pam Bullington refused to allow Plaintiff to see a physician. [Id.].  In response to his requests, Nurse Bullington told him "No CPAP, you get your shoes when you get to your permanent camp, and nobody here is going to give you a

wheelchair." [Id.]. RMC West actually required even more daily walking than its Main Unit. As a result of using a walker, the pain in Plaintiff's lower back became intense. He also endured formidable pain in his arms from using a walker. [Id. at ¶23].

18.     Plaintiff was in constant agony at RMC due to having to walk with a walker despite his chronic back problems, and from the lack of recuperative sleep due to not having a CPAP machine. [Id. at ¶24]. During this time, he was not achieving the level of deep sleep necessary to heal his body. [Id.]. While he was at RMC West, Plaintiff had a panic attack, dreaming that he was drowning. [Id.]. He woke up in a panic and shot up from his laying position, hitting his head on the metal bed frame above him on the top bunk. [Id.]. Additionally, for diabetics, "untreated sleep apnea can undermine patients' ability to control their blood sugar as a result of the effects constant daytime exhaustion tends to have on diet and exercise." [Exhibit 18 (Spedale affidavit), ¶7].

19.     Plaintiff was transferred to Apalachee Correctional Institution (ACI) on May 4, 2007. [Exhibit 17 (Plaintiff's affidavit), ¶25]. He was placed in the infirmary because of his walker. [Id.]. The next day, Plaintiff was told by Kathryn Land, ARNP, that walkers were not allowed on the compound at ACI. [Id.]. Land told Plaintiff he did not really need a walker. [Id.]. ACI also did not allow wheelchairs. [Id.; Exhibit 15 (Parker deposition), pgs. 11-12]. DOC gave Plaintiff a cane, which he said was inadequate. [Id. at ¶26]. Plaintiff needed a wheelchair. [Id.]. On May 16, 2007, Plaintiff complained to Harold Parker, ARNP at ACI, about not having a wheelchair or a CPAP machine. [Id. at ¶27]. He tried to show Parker a copy of his prescription for his CPAP but Parker refused to look at it. [Id.].

20.     Ultimately, the aforementioned conditions took a serious toll on Plaintiff's health and he was hospitalized. [Id. at ¶28]. On May 23, 2007, Plaintiff was admitted to Jackson Hospital in

Marianna, Florida with Hypercalcemia and Acute Kidney Failure and was treated by Dr. Richard

Christopher for renal failure. [Id.; see Exhibits 1, 2;  Exhibit 14 (Christopher deposition, pgs. 5-6].

Dr. Christopher opined that acute renal failure is more common in those who have Type II diabetes

than in the general population [Exhibit 14 (Christopher deposition), pg. 21].   Indeed, both

uncontrolled hypertension and poorly controlled diabetes can lead to renal failure. [Exhibit 13 (Perez

deposition, pg. 45].  Significantly, Plaintiff's primary care physician stated:

> In patients with hypertension, untreated obstructive sleep apnea can make their hypertension much more difficult to control (even when anti-hypertensive drugs are being used).  Uncontrolled hypertension is a common, major contributing cause of kidney damage or failure.  Untreated sleep apnea can also cause patients to experience rapid heart rates, anxiety or panic attacks caused by a feeling that they are suffocating or dying, and can make patients miserable and disoriented during the day as a result of the fatigue, including headaches, irritability, and excessive daytime sleepiness.

[Exhibit 18 (Spedale affidavit), ¶6].

21.    Dr. Perez had noted during her evaluation that Plaintiff could be suffering from a

kidney problem but did not address it. [See Exhibit 13 (Perez deposition), pg. 24].  Plaintiff was

finally given a CPAP machine during his hospitalization. [Exhibit 17 (Plaintiff's affidavit), ¶28].

He was thereafter transferred to Memorial Medical Center in Jacksonville on May 26, 2007 and

discharged back to RMC on June 1, 2007. [Id.]. He was not seen by a Pulmonologist until June 27,

2007. [Id. at ¶29].  By this time, Plaintiff had lost about sixty-six (66) pounds. [Id.].

22.    On July 16, 2007, Dr. Page Smith again denied Plaintiff's request for a wheelchair.

[Id. at ¶30].  Four days later, on July 20, 2007, DOC physician, Dr. Izra, issued the wheelchair but

he told Plaintiff "they will get me for this." [Exhibit 17 (Plaintiff's affidavit), ¶30].

23.    Plaintiff was harassed at DOC due to his disabilities. [Id. at ¶31]. The guards keyed

in on Robert Giddings and Plaintiff for harassment. [Id.].  Like Plaintiff, Giddings was an inmate at the RMC West unit who used a walker. [Id.].  By way of example, the guards made the two of them actually walk farther than the non-disabled inmates. [Id.].  They made them take the longest route possible to their destination. [Id.].  Their intention was apparently to make Giddings and Plaintiff walk as much as possible because they used walkers. [Id.].  They also made either Giddings' dorm or Plaintiff's dorm be the last dorm to be let off the rec field. [Id. at ¶32].  The two of them therefore were made to stand in line longer than the inmates from any other dorm, which increased Plaintiff's pain. [Id.].

24.     In one instance, Plaintiff was walking with his walker back to his dorm and Officer Williams at the RMC West Unit stopped him. [Id. at ¶33].  He told Plaintiff to wait and asked where the "other one" was, referring to Giddings, the other inmate who used a walker. [Id.].  Williams said "wait, we'll have a walker race." [Id.].  Officer Jennings at the RMC Main Unit also singled out Plaintiff. [Id. at ¶34].  He refused to honor Plaintiff's "no prolonged standing pass" when Plaintiff was at the med line. [Id.].  The pass was supposed to limit Plaintiff's standing to fifteen or twenty minutes. [Id.].  Because of Jennings' refusal to honor the pass, Plaintiff was forced to stand in line for upwards of forty-five minutes.  [Id.].  Jennings made Plaintiff stand even though there were benches in the area. [Id.].  Other officers also refused to honor Plaintiff's "no prolonged standing pass." [Id.].

25.     Officer Mobley at the RMC West Unit clinic routinely required Plaintiff to walk approximately 1,200 feet back to the dorm, just to then have him walk back to the chow hall ten minutes later. [Id. at ¶35].  Mobley commented that walking was good for Plaintiff, to which Plaintiff responded, "Not on my bad back." [Id.].  Officer Cross at the RMC Main Unit ordered

9

Plaintiff to take the long way around in front of the cafeteria to get to the recreation area. [Id. at ¶36]. Every day, Cross directed Plaintiff to the door that required him to walk a distance that was four or five times longer than the distance from the other door. [Id.]. Other prisoners were allowed to go the short way. [Id. at ¶37]. Cross also always directed Plaintiff to go to whichever of the two chow lines was longer. [Id.]. He knew Plaintiff had difficulties getting around and singled Plaintiff out for abuse and harassment because of it. [Id.]. Sergeant Dean at the RMC Main Unit then saw Plaintiff heading toward the rec yard canteen, stopped him, and ordered him to take the long way. [Id. at ¶38]. Cross and Dean laughed at Plaintiff when they gave these orders. [Id.].

26.     Officer T.J. Jordan at ACI refused to honor Plaintiff's "no-prolonged standing" pass as well. [Id. at ¶39]. Jordan was the bus driver who drove inmates back and forth between the Main Unit and the West Unit at ACI. [Id.]. He made Plaintiff stand at the gate for about fifteen minutes. [Id.]. Plaintiff then had to walk about a quarter mile to the bus. [Id.]. Plaintiff showed Jordan his pass and Jordan told Plaintiff that if he fell out (of line) on him that he would put a boot in Plaintiff's ass and kick him to the bus. [Id. at ¶40].

27.     Plaintiff was moved to Gulf Correctional Institution Annex in August 2007. [Id. at ¶41]. He remained at this facility until his release from DOC in February 2010. [Id.]. The rec yard at Gulf CI had deep white sand that was extremely difficult for Plaintiff to get through on his wheelchair. [Id. at ¶42]. DOC had orderlies who were supposed to push Plaintiff around in his wheelchair which they refused to do, with immunity. [Id.].

28.     Because the orderlies refused to push Plaintiff, he was unable to go to the rec yard because of an arduous, near impossible uphill climb on the way back from the rec yard. [Id. at ¶43]. Plaintiff also missed out going to the canteen, library, and barber shop because the rec yard

controlled access to these services. [Id.].  Plaintiff addressed this access issue in a grievance, but DOC did nothing to accommodate him. [Id.; see Exhibit 12].  Plaintiff told the nurse who assigned orderlies that the orderlies were leaving him stranded.  [Id. at ¶44].  However, there were still occasions afterward where Plaintiff was not able to access the rec yard because he was left stranded.

29.     The restroom at Gulf Annex's rec yard was also inaccessible to wheelchairs.  [Id. at ¶45].  There was a sidewalk to get to the room, but the guards refused to allow any inmate to use this sidewalk.  [Id.].  The only route by which guards allowed the inmates to access the restroom was impossible for Plaintiff to use because it contained deep sand, which was impassable in his wheelchair.  [Id. at ¶46].  Plaintiff filed reasonable accommodation requests under the ADA to address these access issues. [Id. at ¶47; see Exhibits 11 and 12].  Instead of correcting the problem of wheelchair accessibility at the weight room and rec yard restroom at Gulf Annex, DOC deliberately chose to ignore it. [Id.].  Plaintiff also had attempted to address through a grievance the problems with DOC not honoring his "no prolonged standing pass." [Id.; see Exhibit 12].

30.     This harassment from DOC persisted in 2009. [Exhibit 17 (Plaintiff's affidavit), ¶48]. Around May of that year Sergeant Foster at the Gulf Annex gathered the four or five inmates who were in wheelchairs - including Plaintiff - and required them to dust the dorms five days a week. [Id.].  Foster told them they were to dust from 7:00 a.m. to 3:00 p.m.. [Id.].  The dusting job was in addition to the disabled inmates' usual jobs, which were as "Housemen." [Id. at ¶49].  Their usual job entailed essentially janitorial duties. [Id.].  Plaintiff's job was mainly to fold the laundry. [Id.]. Foster did not give the non-disabled inmates extra work assignments and they worked one hour less than the disabled inmates each day.  [Id.].

31.     Plaintiff filed a grievance on May 6, 2009 letting DOC know that he was not

11

physically capable of dusting for that long of a time period. [Id. at ¶51; Exhibit 6]. Plaintiff noted

that this was due to him being disabled as a breathing care patient. [Id.]. Plaintiff relayed to DOC

that Foster called the disabled inmates "handicraps." [Id.]. Plaintiff filed another grievance with

DOC about the extra dusting assignment on May 12, 2009. [Id. at ¶52; Exhibit 7]. He noted how

Foster said he gave the disabled inmates the extra assignment because they were "slower than the

others." [Id.]. Plaintiff relayed that Foster was discriminating against them due to their disabilities

in violation of the Americans with Disabilities Act. [Id.]. Plaintiff further told DOC about a previous

grievance in which he made an ADA request for a reasonable modification to make the rec yard at

Gulf Annex wheelchair accessible. [Id. at ¶53]. He noted how Foster had then begun retaliating

against him after the grievance. [Id.].

32.     When the disability-based harassment at DOC continued, Plaintiff filed yet another

report with DOC. [Id. at ¶54]. On June 19, 2009 he filed a Request for Administrative Remedy or

Appeal. [Id.; Exhibit 8]. Plaintiff once again notified DOC that Foster was singling out the four

wheelchair-disabled prisoners by giving them the extra dusting duty as a punitive measure. [Id.].

Plaintiff informed DOC that Foster's conduct violated Title II of the ADA. [Exhibit 8; Exhibit 17

(Plaintiff's affidavit), ¶55]. He told them it was not an isolated act of discrimination. [Id.]. He put

them on notice of the harassment; he publicized the inherent prejudice and open hostility by DOC

staff against disabled prisoners. [Id.]. Plaintiff again formally notified DOC of the harassment and

ADA violations on August 5, 2009. [Exhibit 17 (Plaintiff's affidavit), ¶56; Exhibit 9].

33.     DOC failed to adequately address Plaintiff's reports of disability-based harassment.

[Exhibit 17 (Plaintiff's affidavit), ¶57]. Though the amount of dusting decreased after a couple of

months, Plaintiff was still required to do the extra dusting assignment until the time he left

confinement in February 2010. [Id.].

34.     Plaintiff took notes during his confinement about his problems while in DOC and the

events that had occurred. [Id. at ¶58]. Sergeant Foster took these notes from Plaintiff in November,

2009. [Id.]. Plaintiff had filed grievances on Foster prior to him confiscating the notes and believes

that Foster took his notes in retaliation for him complaining about Foster's non-compliance with the

ADA through his wheelchair assignments. [Id.]. Plaintiff notes contained substantial documentation

of the events discussed above. [Id.].

35.     Plaintiff's back suffered permanent damage from his improper treatment at DOC. [Id.

at ¶59]. He now suffers from chronic and substantial back pain. [Id.]. Plaintiff also suffered a loss

of kidney function. [Id.]. He now has periods when he endures intense, weeks-long pain in his

kidneys. [Id.]. Plaintiff also suffered mentally during his ordeal with DOC. [Id. at ¶60]. Because

of the grave risks DOC was causing to his health, he wrote his will while in prison and drafted last

letters to his wife and sister. [Id.].

## II.    STANDARD OF REVIEW

To successfully win this Motion for Summary Judgment, Defendants must show that

"everything in the record . . . demonstrates that no genuine issue of material fact exists." Tippens

v. Celotex Corp., 805 F.2d 949, 952 (11th Cir. 1986). Genuine issues of fact are those where the

evidence is such that a reasonable jury could return a verdict for the non-movant. See e.g.

Anderson v. Liberty Lobby, 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). In

deciding whether a genuine issue of material fact exists, the Court must accept the truth of

Plaintiff's allegations and evidence and "must draw all reasonable inferences in Plaintiff's

favor." Cottrell v. Caldwell, 85 F.3d 1480, 1486 n.3 (11th Cir. 1996).

In <u>Wright v. Southland Corporation</u>, 187 F.3d 1287, 1305 (11th Cir. 1999), the Eleventh

Circuit overturned a grant of summary judgment against the plaintiff, emphasizing that

credibility determinations, such as believability of witnesses, "can be made only after trial," and

not on a motion for summary judgment.  In <u>Damon v. Fleming Supermarkets of Florida, Inc.</u>, 196

F.3d 1354, 1361 (11th Cir. 1999), the Court again emphasized that "in the summary judgment

context. . . [the court] must avoid weighing conflicting evidence or making credibility

determinations."  "[F]actual disputes that are *material* preclude entry of summary judgment."

<u>Stephens v. City of Butler, Alabama, et al.</u>, 2007 WL 1834898 (S.D. Ala.).

## III.  DEFENDANT PEREZ WAS DELIBERATELY INDIFFERENT TO PLAINTIFF'S SERIOUS MEDICAL NEEDS

The government has an obligation to provide medical care to those it incarcerates. <u>Estelle</u>

<u>v. Gamble</u>, 429 U.S. 97, 97 S.Ct. 285, L.Ed.2d 251 (1976).  A prison violates the Eighth

Amendment proscription against cruel and unusual punishment when it exhibits a "deliberate

indifference to serious medical needs of prisoners." <u>Id.</u> at 104.  Deliberate indifference has three

components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by

conduct that is more than mere negligence.  <u>Farmer v. Brennan</u>, 511 U.S. 825, 843, 114 S.Ct.

1970, 128 L.Ed.2d 811 (1994); <u>Estelle</u>, 429 U.S. at 104.  A determination of deliberate

indifference involves an examination of two elements: (1) the seriousness of the prisoner's

medical need, and (2) the nature of the defendant's response to that need. <u>Sult v. Prison Health</u>

<u>Services Polk County Jail</u>, 806 F.Supp. 251, 251 (M.D. Fla. 1992); <u>Warwick v. Miller</u>, 1997 WL

34626527, at *5 (M.D. Fla. 1997).  Through the submitted evidence, Plaintiff has shown the

existence of  multiple serious medical needs to which Defendant Perez did not adequately

respond and utterly failed to address.  He has established that his obstructive sleep apnea necessitated the use of a CPAP machine.  He has also shown that his chronic back pain, gout, diabetes, hypertension, heart disease, and obesity, in conjunction, gave rise to a clear need for a wheelchair and diabetic shoes.

An inmate may show deliberate indifference in a number of ways: (1) actual knowledge of a serious need for medical care, plus a failure to treat; (2) delay in treatment, potentially "even for a period of hours"; (3) "grossly inadequate care"; (4) "a decision to take an easier but less efficacious course of treatment; or (5) "medical care which is so cursory as to amount to no treatment at all.  McElligott v. Foley, 182 F.3d 1248, 1255 (11ᵗʰ Cir. 1999).  Under these facts, Plaintiff has established deliberate indifference in each of these ways.

### A.  Perez Failed to Treat Plaintiff's Known, Serious Medical Needs

The knowledge of the need for medical care and intentional refusal to provide that care has consistently been held to surpass negligence and constitute deliberate indifference. Ancata v. Prison Health Services, 769 F.2d 700, 704 (11ᵗʰ Cir. 1985); Carswell v. Bay County, 854 F.2d 454, 457 (11ᵗʰ Cir. 1988)(sufficient evidence existed for jury to find deliberate indifference where prison medical staff treated some of plaintiff's health problems but ignored others).  "A jury could infer deliberate indifference from the fact that [Perez] knew the extent of [Plaintiff's] pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve [Plaintiff's] condition." McElligott, 182 F.3d at 1257-58 (quoting Hathaway v. Coughlin, 37 F.3d 63, 68 (2d Cir. 1994)).

The trier of fact may infer deliberate indifference when prison personnel ignore without explanation a prisoner's serious medical condition that is known or obvious to them. Thomas v.

15

Town of Davie, 847 F.2d 771, 772-73 (11th Cir. 1988).  Defendant does not argue that Plaintiff's

obstructive sleep apnea does not qualify as a serious medical need.  This is appropriate, since a

medical need qualifies as serious so long as society would consider the risk associated with not

treating the condition as "so grave that it violates contemporary standards of decency . . ."

Helling v. McKinney, 509 U.S. 25, 36, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993).  Certainly society

(and apparently the Defendants' own expert) view the risks associated with untreated sleep apnea

-- which Defendant described as ten-to-twenty-second pauses in breath which occur upwards of

more than thirty times per hour -- as grave. [See Doc 44-2, pgs. 5-6].

    While employing an alternate form of treatment for a medical condition does not amount

to deliberate indifference,[1] an outright refusal to provide any treatment does.  Though Defendant

contends that Plaintiff has presented "no evidence" that Plaintiff was legally entitled to treatment

for the potentially fatal condition of sleep apnea, and that Perez "was not required to rely on his

representations," as to the existence of this condition in the absence of any effort whatsoever to

confirm or deny it, the records actually show that Perez accepted Plaintiff's history of sleep apnea

with use of a CPAP machine as part of his medical history. [Exhibit 4].  She plainly *did* rely on

his representations in crafting her records of her examination of him.  Where liability attaches is

in the fact that she did **nothing** to treat the condition,   Indeed, during her deposition, she was

baffled as to why she discontinued Plaintiff's CPAP pass. [See Statement of Facts, ¶9].

Defendant cannot seriously argue that Perez was not deliberately indifferent to Plaintiff's chronic

need for a medical adaptive device -- his CPAP machine.  She callously disregarded Plaintiff's

pleas for a CPAP machine despite her knowledge of this serious medical need.  This violates the

---

[1]        Dobbins v. Cummins, 2011 WL 2447705 at *11 (M.D. Ala. 2011).

Eighth Amendment's evolving standard of decency.

Perez also contends that it was her professional judgment not to treat the sleep apnea. However, the expert testimony from Dr. Patel establishes that a doctor in Perez's shoes was justified in deferring treatment for Sleep apnea and the CPAP machine *if* (and only if, one may fairly read into the affidavit), she "was waiting for records to confirm the diagnosis and treatment recommendations." [Statement of Facts, ¶11].  Unfortunately, rather than waiting on his medical records, the only thing Perez was waiting on was for Plaintiff to leave Lake Butler.  [See Doc 44-3, pg. 6].  Perez never prescribed nor allowed Plaintiff to have a CPAP machine.  She never requested his medical records for follow-up.  She never ordered a sleep study.  She never referred him to a Pulmonologist, even though she understood that to be the process for treating inmates like Plaintiff.  [Statement of Facts, ¶10]. Based on her inaction, Dr. Patel concluded that Perez subjected Plaintiff to risk of serious harm by her failure to initiate any CPAP therapy. [Doc 44-2, pg. 5].  The very fact that Perez, through her deliberate indifference, exposed Plaintiff to an unreasonable risk of serious harm to his future health creates a question for the jury. See Helling, 509 U.S. at 35 (prisoner's Eighth Amendment claim could be based upon possible future harm to health arising out of exposure to environmental tobacco smoke).

**B.  Unconstitutional Delay In Treatment**

Perez attempts to color Plaintiff's claim not as one for outright denial of medical care, but rather as one for a delay in medical care.  Plaintiff has met his burden in this regard, too.  In addition to an official's outright refusal to treat, an official's delay in providing treatment for serious medical needs - even for a period of hours - may constitute deliberate indifference. See Harris v. Coweta County, 21 F.3d 388, 393-94 (11th Cir. 1994). A core principle of Eighth

Amendment jurisprudence is that a prison official may not delay in providing medical treatment

or provide grossly inadequate treatment, and cause a prisoner to needlessly suffer that pain

resulting from his illness. <u>McElligott</u>, 182 F.3d at 1257.  Delays in medical treatment are

actionable when the delay was objectively sufficiently serious, i.e. it must result in the denial of

the minimal civilized measures of life's necessities. <u>Farmer</u>, 511 U.S. at 834.  This Circuit has

repeatedly recognized that delays of less than one week for known medical problems constitute

constitutionally cognizable injuries that are not proper for summary dismissal. <u>See</u> <u>H.C. by</u>

<u>Hewett v. Jarrard</u>, 786 F.2d 1080 (11th Cir. 1986) (three-day delay in treating a negligible, non-

permanent shoulder injury); <u>Seals v. Shah</u>, 145 F.Supp.2d 1378, 1385-86 (N.D. Ga. 2001)(delay

in treatment that caused inmate four days of severe leg pain); <u>Aldridge v. Montgomery</u>, 753 F.2d

970, 972-73 (11th Cir. 1985) (ignoring bleeding cut for two and a half hours).

    While Plaintiff maintains that this was an outright denial by Perez to treat his known,

serious medical condition,[2] it certainly was an unconstitutional delay in treatment.  If a three-day

delay in treating a non-emergency, non-permanent shoulder injury was actionable in <u>Jarrard</u>,

Plaintiff's approximately eleven-week wait for his CPAP machine qualifies as an Eighth

Amendment violation.  Perez claims it was reasonable to defer treatment until Plaintiff was sent

to a permanent facility because inmates only remain at RMC for a week or two.  This is strongly

undermined by the other evidence in this case.  From the observation of both Plaintiff and a

RMC nurse, the average inmate remained at RMC for two or three months until moved to a

permanent facility. [Statement of Facts, ¶6].  It is unreasonable for a medical doctor to withhold

---

    [2]    <u>See</u> arguments, *supra,* with respect to "Failure to Treat a Known, Serious Medical
Need."

medical treatment for months with respect to a condition she knows is serious and required medical treatment.

Under Eleventh Circuit precedent, Perez is also liable for her refusal to issue Plaintiff a wheelchair and diabetic shoes.  Delays for even less serious injuries or less urgent needs can still meet the deliberate indifference standard.  See Harris v. Coweta County, 21 F.3d 388, 394 (11th Cir.1994)(stating, "Delayed treatment for injuries that are of a lesser degree of immediacy than broken bones and bleeding cuts, but that are obvious serious medical needs, may also give rise to constitutional claims.")(citing Carswell v. Bay County, 854 F.2d 454 (11th Cir.1988)).

Without question, Plaintiff communicated to that his back was killing him from walking and standing in lines, that he was physically unable to endure the amount of walking and standing that was required at DOC, and that he was presently prescribed pain medication for his back.  Perez herself observed that Plaintiff suffered from chronic low back pain, had a compression deformity of two of his vertebrae and was obese.  Nevertheless, she denied Plaintiff access to a wheelchair.  Nor did she  provide him with his prescribed pain medication, or even Ibuprofen.  Perez also offered no justification for denying Plaintiff his requested soft, diabetic shoes.

### C.  Perez Provided Grossly Inadequate Care

A complete denial of readily available treatment for a serious medical condition constitutes deliberate indifference.  Harris v. Coweta County, 21 F.3d 388, 393 (11th Cir.1994).  DOC has CPAP machines readily available - this is evident from Plaintiff ultimately receiving a CPAP machine.  RMC had electrical outlets in its dorms necessary to power the CPAP machine.  Obstructive Sleep apnea is a serious medical condition - Perez concedes as much.  She knew of

Plaintiff's condition as she listed sleep apnea on Plaintiff's assessment form.  Perez offered

Plaintiff no alternative treatment to address his obstructive sleep apnea.  These facts show that t

Perez was deliberately indifferent to Plaintiff's medical needs.[3]

Defendant was likewise deliberately indifferent to Plaintiff's needs for a wheelchair and

diabetic shoes.  First, individually or in concert, Plaintiff's chronic back pain, hypertension, heart

disease, diabetes, gout, and his obesity created an objectively serious medical need for one or

both of these items.  The threshold for what constitutes a serious medical need is not as high as

Defendant maintains.  This Circuit has found as serious medical needs which require proper care

such relatively immediately treatable conditions as scabies[4] and a dog bite.[5]

Second, given the totality of the information Perez knew about Plaintiff, it was

deliberately indifferent for her to summarily deny his request for a wheelchair.  A serious medical

condition exists when severe back pain occurs on a daily basis and prevents the plaintiff from

walking normally. Parzyck v. Prison Health Services, 290 Fed. Appx. 289, 291 (11th Cir.2008).

Perez was not only aware of Plaintiff's conditions, but also that Plaintiff was experiencing

extreme pain from the excessive standing and walking that was required of him at DOC.  It was

simply objectively unreasonable for Perez to disregard the objective evidence that necessitated

Plaintiff's need to avoid excessive standing and walking.

Likewise, denying an inmate his request for softer shoes to curb the effects of a medical

---

[3]     "It is the function of the jury as the traditional finder of the facts, and not the Court, to weight conflicting evidence and inferences..." Lipphardt v. Durango Steakhouse of Brandon, Inc., 267 F.3d 1183, 1186 (11th Cir. 2001).

[4]     Ciccone v. Sapp, 238 Fed.Appx. 487, 489 (11th Cir. 2007).

[5]     Andujar v. Rodriguez, 486 F.3d 1199, 1203-04 (11th Cir. 2007).

condition can constitute deliberate indifference.  Diabetes squarely falls within the definition of an objectively serious medical need.  See Beatty v. Davidson, 713 F.Supp.2d 167, 174 (W.D. N.Y. 2010)("This Court need not linger on this point: diabetes is a sufficiently serious medical condition to meet the objective prong.").  In Minton v. Spann, 2007 WL 1099114 at *17-18 (N.D. Fla. 2007), the court denied summary judgment as to whether the denial of soft shoes violated the Eighth Amendment where the doctor had not provided a medical reason for denying the shoes.  "Without a basis for finding a medical reason to support a difference in medical opinions, this decision could be viewed by a reasonable jury as having been made solely on a cost basis. Denying prescribed treatment because of cost, without a medical basis, may violate the Eighth Amendment." Id.  Clearly, Plaintiff's intense pain persisted while he used the insoles. The combination of having to walk while not having the benefits of softer shoes created a prolonged, intolerable situation for Plaintiff.

### D.  Perez Took an Easier but Less Efficacious Course of Treatment

Deliberate indifference may also be established by showing a decision to take an easier but less efficacious course of treatment.  See Waldrop v. Evans, 871 F.2d 1030, 1034-35 (11th Cir. 1989).  The court in McElligott v. Foley,[6] denied summary judgment where the defendant knowingly took an easier course of treatment by overlooking the inmate's need for further diagnosis and choosing not to take further action until he received the results of a CT scan and chest x-ray he had taken of the prisoner. Id. at 1255.  Perez's conscious decision to do nothing for Plaintiff's sleep apnea is materially indistinguishable from Foley refusing to alleviate McElligott's pain in McElligott.  The only difference here is that, unlike Foley, who ordered a

---

[6]      Cited *supra*.

21

CT scan and chest x-ray for the plaintiff, Perez refused to order a sleep study, refer Plaintiff to a Pulmonologist, or consult his medical records to ascertain his need for a CPAP.  It would be unduly generous to give Perez credit for taking an easier course of action when in reality she took no action at all.

### E.  Utterly Cursory Medical Treatment

Perez's treatment of Plaintiff was utterly cursory.  She exhibited indifference and antipathy toward Plaintiff's serious medical needs.  In lieu of treating him, she told him to "sit back and shut up."  The Eleventh Circuit has often recognized the failure of this nature to treat an inmate's pain as actionable deliberate indifference. In Aldridge v. Montgomery, 753 F.2d 970, 972-73 (11th Cir. 1985), the court reversed a directed verdict for officers who failed to provide an inmate with an ice pack and aspirin for pain caused by a bleeding cut.  Significantly, with respect to Plaintiff's kidney's, Perez had noted during her March 6, 2007 evaluation that Plaintiff could be suffering from a kidney problem but, again, did not act to address that condition. [Statement of Facts, ¶21].  Two months later, Plaintiff suffered nearly complete kidney failure.

### IV.  PLAINTIFF HAS SHOWN A CONSTITUTIONAL INJURY

### A.  The Delay in Treatment Worsened Plaintiff's Physical Condition[7]

Defendant emphasizes that in a delay of medical care claim a plaintiff must show a "substantial" harm.  In such allegations, the "delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay." Scott v. Patterson, 2011 WL 902104 at *5 (S.D. Ala. 2011).  Here, it is evident that Plaintiff's renal failure may be causally linked to the

---

[7]        This section supports the arguments asserted in Section III.B., above.

significant delay in getting him a CPAP machine.  Per Plaintiff's physician, Dr. Spedale:

> In patients with hypertension, untreated obstructive sleep apnea can make their hypertension much more difficult to control (even when anti-hypertensive drugs are being used).  Uncontrolled hypertension is a common, major contributing cause of kidney damage or failure.  Untreated sleep apnea can also cause patients to experience rapid heart rates, anxiety or panic attacks caused by a feeling that they are suffocating or dying, and can make patients miserable and disoriented during the day as a result of the fatigue, including headaches, irritability, and excessive daytime sleepiness. [Exhibit 18].

Plaintiff's renal failure occurred following two months without use of his CPAP machine.

Perez is to blame for Plaintiff not having a CPAP.  And, there was no justifiable reason for the

delay according to Perez.  Plaintiff has thus met his burden on this theory.

### B.  Plaintiff Has Adequately Shown Infliction of Suffering as Damages[8]

Generally, the Eleventh Circuit uses a fluid approach to determine which injuries are

protected by the Eighth Amendment.  Harris v. Garner, 190 F.3d 1279, 1287 (11th Cir. 1999).

This Circuit has never required the prisoner to show a physical injury.  Id..  With respect to his

Sleep apnea, Plaintiff has surely established that this condition, if left untreated, posed a

substantial risk of serious harm.  He has shown the infliction of unnecessary pain and suffering.

Nothing more is required to establish deliberate indifference.  See Taylor v. Adams, 221 F.3d

1254, 1258 (11th Cir. 2000) (internal quotations and citations omitted); Collins v. Homestead

Correctional Inst., 2010 WL at *5 (S.D. Fla. 2010) (listing elements of an Eighth Amendment

claim for damages under § 1983).  Specifically, Plaintiff has shown that his pain worsened every

day, that he encountered intense pain in his lower back and arms from using a walker, that he was

in constant agony from the lack of recuperative sleep associated with no CPAP machine, that he

---

[8]       This section supports the arguments asserted in Sections III.A, C, D, and E., above.

was not achieving the level of deep sleep necessary to heal his body, and that he violently hit his

head on the metal bed frame when he awoke from a panic attack. [Statement of Facts, ¶s 12, 17-

18].

## V. PEREZ IS NOT ENTITLED TO QUALIFIED IMMUNITY ON THE § 1983 CLAIM

Defendant appears to concede that the constitutional right in question was clearly

established but she asserts that she is entitled to qualified immunity because her actions were

arguably and objectively reasonable.  Where actions hinge on the appropriateness of the actions

of medical professionals, the Eleventh Circuit notes that the testimony of medical experts aid the

courts in determining whether qualified immunity is warranted. Dolihite v. Maughon By and

Through Videon, 74 F.3d 1027, 1046 (11th Cir. 1996).

> Such expert medical testimony, making reference to specific deficiencies in a
> defendant's treatment and specific medically accepted standards might, in
> conjunction with the specific facts of a case, persuade a court that the medical
> defendant's actions in the case were clearly as great a departure from appropriate
> medical standards as previous departures found unconstitutional in prior cases—i.e.,
> . . . that a reasonable professional in defendant's shoes would have known that his
> challenged actions (or inaction) violated plaintiff's constitutional rights. Id..

Qualified immunity is not appropriate where there is conflicting expert opinion testimony

as to whether a doctor met the professional standards of care expected of her under the

circumstances. Greason v. Kemp, 891 F.2d 829, 835 (11th Cir. 1990)(denying qualified immunity

because a reasonable person in defendant physician's position would have known that the care

delivered constituted deliberate indifference); see also Waldrop v. Evans, 871 F.2d 1030, 1034-35

(11th Cir. 1989)(conflict among the experts concerning the propriety of the psychiatrist's professional

judgment calls had to be resolved by the jury); Rogers v. Evans, 792 F.2d 1052, 1058 (11th

Cir.1986)("Whether an instance of medical misdiagnosis resulted from deliberate indifference or

negligence is a factual question requiring exploration by expert witnesses.").

Defendant wants this Court to determine as a matter of law that it was objectively reasonable for Perez to defer medical action for weeks and months to another doctor at another facility where Plaintiff would ultimately be housed.  First, this argument is fundamentally flawed because prisoners often remained housed at RMC for two or three months before being moved to a different facility which was common knowledge to Perez as a DOC employee at RMC.  Second, there remains an inherent factual dispute by virtue of the conflicting physician testimony.  Defendant proffers an expert who opines that kidney failure is not a consequence of untreated sleep apnea.  Plaintiff offers the testimony of Plaintiff's treating physician who opines untreated obstructive sleep apnea can make hypertension much more difficult to control and that uncontrolled hypertension is a common, major contributing cause of kidney damage or failure.  This is a critical factual dispute to be submitted to the trier of fact.

## VI.  GENUINE ISSUES OF MATERIAL FACT REMAIN ON THE ADA CLAIMS

Under Title II of the Americans with Disabilities Act (ADA), "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  To meet his prima facie showing of discrimination under the ADA, Plaintiff must show that (1) he is a qualified individual with a disability; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability. Bircoll v. Miami-Dade County, 480 F.3d 1072, 1083 (11th Cir. 2007).

25

**A.      Plaintiff Was A "Qualified Individual With A Disability"**

The ADA defines the term to include anyone with a disability "who, with or without

reasonable modifications to rules, policies, or practices, the removal of architectural,

communication, or transportation barriers, or the provision of auxiliary aids and services, meets

the essential eligibility requirements for the receipt of services or the participation in programs or

activities provided by a public entity." 42 U.S.C. § 12131(2).  "Disability" is defined under the

ADA as "a physical or mental impairment that substantially limits one or more of the major life

activities of such individual." 42 U.S.C. §12102(2).  Whether the conduct affected is a major life

activity for purposes of the Act is a legal question for the court. <u>See</u> <u>Bristol v. Bd. of County</u>

<u>Comm'rs</u>, 281 F.3d 1148, 1158 (10th Cir.), <u>rev'd in part on other grounds</u>, 312 F.3d 1213 (10th

Cir.2002)(en banc).  Ascertaining whether the impairment substantially limits the major life

activity is a factual question for the jury. <u>See</u> <u>Bristol</u> at 1157; <u>Frazier v. Smith,</u>12 F. Supp.2d

1362 (S.D. Ga. 1998).

At a minimum, Plaintiff was substantially limited in his major life activities of walking,

sleeping, breathing, and working, each of which is recognized as a major life activity. 29 C.F.R.

§1630.2(j)(1) App. (1996).  "Substantial limitations" are those that render an individual:

> (I)   unable to perform a major life activity that the average person in the general
> population can perform; or
>
> (ii)   significantly restricted as to the condition, manner or duration under which an
> individual can perform a particular major life activity as compared to the condition,
> manner or duration under which the average person in the general population can perform
> that major life activity.

<u>Id.</u>.

Sleep apnea has been found to be substantially limiting where there are signs of breathing

problems while sleeping and where evidence suggested the plaintiff does not receive a sufficient amount of quality sleep. Silk v. City of Chicago, 1997 WL 790598, *7-8 (N.D. Ill. 1997). Whether a person's sleep apnea qualifies as a disability under the Act is a question of fact. West v. Town of Jupiter Island, 149 F.Supp.2d 1293, 1298 (S.D. Fla. 2000).  Perez knew that Plaintiff had been diagnosed many years ago with obstructive sleep apnea, that he had used a CPAP machine for years, that his condition resulted in anxiety attacks, and that he suffered from shortness of breath.  Plaintiff's sleep and breathing are severely impaired in both quantity and quality, even with the use of his CPAP machine. See Brown v. Chatman, 2010 WL 3717283 at *5 n. 3 (M.D. Ga. 2010) (for actions taken prior to 2009, courts should take into consideration ameliorative effects of medications and medical devices when determining whether an individual has a "disability").

Under these facts, it would be improper to take into account the mitigating effect of a CPAP machine when determining whether Plaintiff had a substantial limitation in his sleeping. It was the denial of the mitigating device that Defendant seems to ignore.  Second, even with the use of a CPAP, Plaintiff's sleep is substantially limited.  He endures panic attacks two to three times per week even with the use of the CPAP machine. [Statement of Facts, ¶4].  Even with the machine, Plaintiff gets only three to four hours of quality sleep per night. [Id.].  Plaintiff only sleeps a maximum of two to three hours at a time before waking up. [Id. at ¶5].  It is evident that the vast majority of society enjoys higher sleep functions.

With respect to walking, the EEOC's regulations define a person with a walking disability as someone who "can only walk for very brief periods of time."  29 C.F.R. §1630.2(j).

The EEOC Compliance Manual on the ADA[9] provides the following two examples relating to walking:

> Example 1 - CP has a permanent knee impairment that causes him pain when he walks for extended periods. He can walk for ten miles at a time without discomfort, but he experiences pain on the eleventh mile. CP's knee impairment does not substantially limit his ability to walk. The average person in the general population would not be able to walk for eleven miles without experiencing some discomfort.

> Example 2 - CP, who has sickle cell anemia, frequently experiences severe back and joint pain. As a result of the sickle cell disease, CP often cannot walk for more than very short distances. CP's impairment (sickle cell anemia) substantially limits his ability to walk.

When the facts in this case are taken in the light most favorably to Plaintiff, there could be no conclusion other than that he is disabled.  It is without question that the average person in the general population can walk far more than thirty to forty feet before requiring rest.  They can walk much farther than one-hundred feet without experiencing significant pain.  They also live pain-free in prison without the assistance of a walker or wheelchair.[10]   Plaintiff enjoyed none of these luxuries during his incarceration due to his physical limitations.

The EEOC Compliance Manual uses the following example to describe how a finding that an individual is substantially limited in *walking* is also dispositive as to whether that person is substantially limited in *working*: "if an individual's arthritis makes it unusually difficult (as

---

[9]      EEOC regulations are entitled to substantial deference.  See e.g., Deane  v. Pocono Med. Ctr., 142 F. 3d 138, 143 n. 4 (3d Cir. 1998).

[10]      See Hagan v. Mason Dixon Intermodal, Inc., 2007 WL 2462639 at *11 (S.D. Ga. 2007)("plaintiff need not present comparator evidence as to the functional abilities of the average person in order to make a *prima facie* showing of a disability," noting that a fact-finder can use her own life experiences and common sense to access the extent of an impairment); Lusk v. Ryder Integrated Logistics, 238 F.3d 1237, 1240 (10th Cir. 2001)(Plaintiff does not need to prove how the 'average person' performs the major life activity to withstand summary judgment where the impairment appears substantially limiting on its face).

compared to most people or to the average person in the general population) to walk, then the individual is substantially limited in the ability to walk . . . [and] one would not need to ascertain whether the individual is also substantially limited in working." 2 EEOC Compliance Manual Section(s) 902, at 902-18.  Because it is clear that Plaintiff was substantially limited in walking at all relevant times, it is not required to separately determine whether his working limitation qualifies under the ADA.  It does.  Plaintiff has not held a job since 1992, the year he was deemed disabled by the Social Security Administration.  Clearly, when in prison, he was physically unable to perform the duties of the extra dusting assignment forced upon him.  He is substantially limited in his ability to work.

**B.      Plaintiff was Excluded from Prison Benefits, Activities, and Services and was "Otherwise Discriminated Against"**

1.      Deliberate Refusal to Accommodate Fundamental Medical Needs

This is not a case in which Plaintiff is making a claim only on the denial of medical care. That is covered under Plaintiff's §1983 claim discussed above.  Plaintiff's ADA claims include failures by Defendant to provide him with medical devices necessary to accommodate his disabilities and failures to ensure he had access to its services, benefits, and programs.  The Supreme Court recognizes that it is "quite plausible" that ADA violations include a prison's deliberate refusal to accommodate an inmate's disability-related needs in such "fundamentals" as mobility and medical care.  See U.S. v. Georgia, 546 U.S. 151, 157, 126 S.Ct. 877 (2006).  This Circuit liberally construes what counts as "services, programs, or activities of a public entity."

Accordingly, the ADA has been found to cover transportation,[11] the use of jail telephones,[12] and access to televisions.[13] The use of necessary medical equipment such as CPAP machines and wheelchairs equally qualify.

Plaintiff has brought a §1983 claim premised on Eighth Amendment violations and ADA claims which partially intertwine the Section 1983 claims. These same claims were brought by the plaintiff in Rhodan v. Schofield, 2007 WL 1810147 (N.D. Ga. 2007). Rhodan suffered from bladder and bowel control problems. Id. at *3. The defendant failed to provide the requested wheelchair accommodation after Rhodan filed a grievance which indicated that a wheelchair could have alleviated his problem of defecating on himself. Id. at *16. Given those facts, the court denied summary judgment. Id.

Rhodan is instructive for both the denial of the CPAP machine and the denial of the wheelchair and diabetic shoes. Through grievances, Plaintiff put DOC on notice that these devices would alleviate his pain and accommodate his walking and sleeping disabilities. Defendant's denial of Plaintiff's requested accommodation constitutes another violation of the ADA. Failure to accommodate claims are viable under Title II of the ADA. See Hoffman v. Flores, 2011 WL 3897981 at *10 (M.D. Fla. 2011). Plaintiff submitted multiple grievance requests for a CPAP machine in March and April of 2007. [Statement of Facts, ¶15]. One grievance notified DOC that he had been on the CPAP machine for years and had suffered from panic attacks since 1992. [Id.]. He also in March 2007 filed a grievance again requesting diabetic

---

[11]    Dukes v. Georgia, 428 F.Supp.2d 1298, 1323 (N.D. Ga. 2006).

[12]    Rylee v. Chapman, 2008 WL 3538559 at *9 (N.D. Ga. 2008).

[13]    Garcia v. Taylor, 2009 WL 2496521 at *10-12 (N.D. Fla. 2009).

shoes. [Id. at ¶16].  He also filed a grievance with DOC asking for a wheelchair.  In May 16,

2007, Plaintiff again complained about not having a wheelchair or a CPAP machine. [Id. at ¶19].

DOC finally gave Plaintiff a CPAP machine in late May and a wheelchair in late July. [Id.

at ¶21-22].  By that time, he had suffered in a multitude of ways, from incessant pain in his back

and arms, to a panic attack, to kidney failure.  Defendant also repeatedly refused to honor

Plaintiff's "no prolonged standing pass," which was necessary due to his disabilities.  This

included instances in which Defendant caused Plaintiff to stand for forty-five minutes for no

reason, and forced him to walk a quarter mile or more at a time. [Statement of Facts, ¶24, 26].

Because Plaintiff had requested accommodations, the Defendant was under the burden to

provide him with reasonable accommodations. Rylee v. Chapman, 2008 WL 3538559 at *9

(N.D. Ga. 2008).  The ADA requires reasonable modifications, those which do not

fundamentally alter the nature of the service provided. Dobbins v. Cummins, 2011 WL 2447705

at *7 (M.D. Ala. 2011).  Defendant makes no attempt to argue that it was unduly burdensome to

have provided the CPAP machine, diabetic shoes, and the wheelchair at the time of Plaintiff's

first, or even second requests.  Defendant does not forbid the use of wheelchairs or CPAP

machines.  This is evident because Plaintiff himself ultimately secured the use of both when

finally ordered.  It would have resulted in no fundamental alteration of Defendant's services to

provide Plaintiff with these necessary accommodations, therefore summary judgment should be

denied..

    2.    Denial of Access to or Benefits of Activity, Service, or Program

Defendant overlooks the fact that the Supreme Court has determined that the ADA covers

a host of activities, programs, services, or benefits in the prison context:

Modern prisons provide inmates with many recreational "activities," medical "services," and educational and vocational "programs," all of which at least theoretically "benefit" the prisoners (and any of which disabled prisoners could be "excluded from participation in"). See Block v. Rutherford, 468 U.S. 576, 580, 104 S.Ct. 3227, 3229-3230, 82 L.Ed.2d 438 (1984) (referring to "contact visitation program"); Hudson v. Palmer, 468 U.S. 517, 552, 104 S.Ct. 3194, 3214, 82 L.Ed.2d 393 (1984) (discussing "rehabilitative programs and services").

Pennsylvania Dept. of Corrections v. Yeskey, 524 U.S. 206, 210, 118 S.Ct. 1952 (1998).

It was extremely difficult, if not impossible, for Plaintiff to access the prison canteen, library, and barber shop at Gulf Correctional Institution because he was unable to get his wheelchair through the deep white sand to access these areas. [Statement of Facts, ¶27]. This unjustified isolation of Plaintiff from accessing these prison services and benefits constitutes discrimination under the ADA. See Olmstead v. L.C. ex. rel. Zimring, 527 U.S. 581, 600, 119 S.Ct. 2176 (1999). Where a defendant's chosen "accommodation" renders a plaintiff isolated from his peers, discrimination has occurred. Garcia v. Taylor, 2009 WL 2496521 at *11 (N.D. Fla. 2009). In Garcia, the court denied summary judgment where some televisions the defendant prison provided to the hearing-disabled plaintiff had closed-captioning while others did not. Though DOC had orderlies who were supposed to push Plaintiff around on his wheelchair, it condoned the orderlies' repeated refusal to do so. [Statement of Facts, ¶27]. Even after Plaintiff grieved this access issue, DOC did nothing to accommodate his access problems. [Id. at ¶28].

Plaintiff's inability to benefit from these services because of his disability creates a triable claim under the ADA. But for Plaintiff's disability, he would have had access to these services which were available to non-disabled inmates. Such evidence gives rise to an inference of discrimination. See Solomon v. Waffle House, Inc., 365 F.Supp.2d 1312, 1331 (N.D. Ga. 2004)(part of establishing a prima facie case of discrimination in a public accommodation is a

showing by the plaintiff that services were available to similarly situated persons outside her protected class who received full benefits or who were treated better).

### C.    DOC's Denials to Plaintiff Were Because of His Disability

Because one could conceivably deduce from a very generous reading of Defendant's Motion that it is claiming that DOC's actions were not based on Plaintiff's disabilities, Plaintiff injects this argument:  Defendant fostered a culture of antipathy toward disabled individuals.  He and other disabled inmates were laughed at.  Defendant mocked them by calling them "handicraps" and encouraging them to engage in a "walker race."  Defendant repeatedly denied Plaintiff's requests for accommodations and likewise refused to remedy his complaints of non-compliance with the ADA. [See Exhibits 7-9, 11-12].  Defendant required Plaintiff and Robert Giddings, another inmate who used a walker, to actually walk farther than the non-disabled inmates. [Statement of Facts, ¶23].  DOC employees made them take the longest route possible to their destination. [Id.].  Defendant also made either Giddings' dorm or Plaintiff's dorm be the last dorm let off the rec field. [Id.].

Perhaps most glaringly, DOC made Plaintiff and his fellow disabled inmates do extra physical duties above and beyond those assigned to non-disabled inmates.  Despite Plaintiff's formal plea for a reprieve due to his disabilities [Exhibit 7], he was required to do the extra dusting duties until he left confinement in 2010.  A jury could thus surely conclude that DOC subjected him to disability-based discrimination.

### VII.  DEFENDANT IS NOT ENTITLED TO SOVEREIGN IMMUNITY

Defendant is correct that the Supreme Court in U.S. v. Georgia held that the state's Eleventh Amendment immunity is abrogated when its conduct in question actually violated the

33

Fourteenth Amendment.  546 U.S. 151, 159 (2006).  However, significantly, the Court declined

to issue judgment on whether the state's immunity could be validly abrogated when the state's

conduct violated Title II of the ADA, but not the Fourteenth Amendment. James v. Campbell,

2007 WL 2083690 at *5 n.5 (M.D. Ala. 2007)(citing U.S. v. Georgia, 126 S.Ct. at 883).

Relatedly, the plaintiff is not required to first establish a Section 1983 violation to abrogate the

immunity. Rhodan v. Schofield, 2007 WL 1810147 at *16 (N.D. Ga. 2007)(sovereign immunity

did not bar plaintiff's ADA Title II claim where there remained a genuine issue of fact over

whether defendant was deliberately indifferent to plaintiff's medical needs when it refused to

provide plaintiff with a wheelchair).

Even assuming, *arguendo*, that some of the actions with respect to Plaintiff are not §1983

violations, they surely violate the ADA.  This includes repeated refusals to accommodate

Plaintiff's sleep apnea or his substantial walking impairment.  It includes its failures to honor his

"no prolonged standing" pass and its requirement that Plaintiff walk the longer routes between

destinations because he is disabled.  It included the extra dusting assignment given only to

Plaintiff and his fellow disabled inmates.  And it includes that the rec yard, rec yard restroom,

canteen, library, and barber shop were inaccessible to those in wheelchairs.

## VIII.  PLAINTIFF HAS PROVEN ADA HARASSMENT AND RETALIATION CLAIMS

### A.    Disability-Based Harassment

Harassment is verbal or physical conduct that has the purpose or effect of creating an

intimidating, hostile, or offensive environment for the prisoner. See Henson v. City of Dundee,

682 F.2d 897, 902 (11th Cir.1982).  Borrowing from the employment context, in determining

whether an environment is hostile or abusive, the Court should include within its consideration

(1) the frequency of the discriminatory conduct; (2) its severity; and (3) whether it is physically

threatening or humiliating, or a mere offensive utterance. See Prado v. L. Luria & Son, Inc., 975

F.Supp. 1349, 1355 (S.D. Fla.1997).

This claim includes actions such as Defendant forcing Plaintiff to walk long distances at

RMC Main and West Units, the "dusting incident," the seizure of Plaintiff's notes, and the

discipline after a knife was planted in his mattress.  Notably, Plaintiff filed not one but several

grievances addressing what he reasonably believed to be disability-based hostility against him.

Overwhelmingly, Defendant did not promptly and adequate remedy the inequities.[14]  Defendant

is liable for these failures and the ongoing injuries Plaintiff sustained as a result.

### B.     Retaliation for Engaging in Protected Conduct

In paragraph 58 of his Complaint, Plaintiff alleged that "[w]hen Plaintiff complained of

or objected to said discrimination, he became the victim of retaliation thereafter."  Nevertheless,

Defendant makes no attempt to earn summary judgment on Plaintiff's retaliation claim.  The

ADA's anti-retaliation provision[15] "allows a complaint of retaliation against a public entity or its

employees governed by Title II in the same manner that this provision allows a complaint of

retaliation against an employer under Title I." Higdon v. Jackson, 393 F.3d 1211, 1218-19 (11th

Cir. 2004)(citing Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1181 n. 3 (11th Cir. 2003)).

The provision protects an inmate who opposes an act or practice made unlawful by the ADA. See

---

[14]     In employment disability harassment claims, the defendant can be liable for the
hostility of its employees if it knew or should have known of the harassment and failed to take
prompt and effective remedial action. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct.
367, 126 L.Ed.2d 295 (1993)

[15]     42 U.S.C. § 12203(a).

Rumler v. Department of Corrections, Florida, 546 F.Supp. 1334, 1341 (M.D. Fla. 2008)(quoting

42 U.S.C. § 12203(a)). To establish a prima facie case of retaliation under the ADA, a plaintiff

must show that: (1) she engaged in statutorily protected expression; (2) she suffered an adverse

action; and (3) the adverse action was causally related to the protected expression. Id. at 1219.

Plaintiff has met his prima facie burden.  He filed multiple grievances in which he

specifically mentioned that DOC was violating the ADA.  Subsequent to his complaints, he

suffered materially adverse consequences.  Like with ADA employment cases, a plaintiff satisfies

element two of his prima facie case if the action is materially adverse. Shotz, 344 F.3d at 1182-

83.  However, the action need not be traumatic to meet this standard. Id..  In Shotz, the court

found as materially adverse the public dissemination of private information about Shotz.  Id. at

1183.  Here, most notably, after Plaintiff filed a grievance informing DOD that Sergeant Foster

imposed a punitive assignment on disabled inmates and called them "handicraps," Foster

retaliated against Plaintiff. [Statement of Facts, ¶31; Exhibit 6].  Foster confiscated Plaintiff's

notes without reason and continued to require Plaintiff to engage in the extra dusting duties.

[Statement of Facts, ¶s 33-34].  In regards to Plaintiff getting discipline for a knife found under

his mattress, he has no way to know if Foster set his up or not.  A jury can decide this issue.

## IX.  INJUNCTIVE RELIEF

This issue is moot.

## X.  CONCLUSION

Defendants' Motion for Summary Judgment should be denied in all respects.

Respectfully submitted,

/s/ Marie A. Mattox
Marie A. Mattox [FBN 0739685]
MARIE A.  MATTOX, P.A.
310 East Bradford Road
Tallahassee, FL 32303
Telephone: (850) 383-4800
Facsimile:  (850) 383-4801
ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been served upon all counsel of record by CM/ECF this 24th day of October, 2011.

/s/ Marie A. Mattox
Marie A. Mattox

37