# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

**STEPHEN GANSTINE,**

    **Plaintiff,**

**v.**
                            **CASE NO. 4:11cv88-RH/WCS**

**EDWIN BUSS, etc., et al.,**

    **Defendants.**

_____/

## MOTION TO ALTER OR AMEND JUDGMENT

On December 27, 2011, Judge Robert Hinkle summarily dismissed Plaintiff's action by Order Granting Defendant's Motion for Summary Judgment, (Doc. 61). CLERK'S JUDGMENT was entered December 28, 2011. (Doc. 62)

Plaintiff requests The Court to entertain this motion as authorized under:

Federal Rules of Civil Procedure Rule 59(a):

(2) *Further Action After a Nonjury Trial.* After a nonjury trial, the court may, on motion for a new trial, open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment.

e) MOTION TO ALTER OR AMEND A JUDGMENT. A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment.

***In support of this motion, Plaintiff does proffer and advance the following***

***facts and issues for The Court's consideration:***

Judge Hinkle based his decision to dismiss Plaintiff's action on a determination

that "This order grants summary judgment primarily on the ground that the facts do

not support the claims       (Doc. 61, pg. 1)

Plaintiff avers issues of fact material to Plaintiff's complaint remain

unresolved. Also, Plaintiff contends other material issues that rightfully should

have been decided by Jury, after proper consideration of the merit of the argument

presented by the opposing parties, were improperly adjudicated by Judge Hinkle

## MEMORANDUM OF LAW

To successfully win this Motion for Summary Judgment, Defendants must show that "everything in the record . . . demonstrates that no genuine issue of material fact exists." Tippens v. Celotex Corp., 805 F.2d 949, 952 (11th Cir. 1986).

Genuine issues of fact are those where the evidence is such that a reasonable jury could return a verdict for the non-movant. See e.g.Anderson v. Liberty Lobby, 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

In deciding whether an issue of material fact exists, the Court must accept the truth of Plaintiff's allegations and evidence and "must draw all reasonable inferences in Plaintiff's favor." Cottrell v. Caldwell, 85 F.3d 1480, 1486 n.3 (11th Cir. 1996).
        (Doc 52, pg. 13)

In Wright v. Southland Corporation, 187 F.3d 1287, 1305 (11th Cir. 1999), the Eleventh Circuit overturned a grant of summary judgment against the plaintiff, emphasizing that credibility determinations, such as believability of witnesses, "can be made only after trial," and not on a motion for summary judgment.

In Damon v. Fleming Supermarkets of Florida, Inc., 196 F.3d 1354, 1361 (11th Cir. 1999), the Court again emphasized that "in the summary judgment context. . . [the court] must avoid weighing conflicting evidence or making credibility determinations."

"[F]actual disputes that are *material* preclude entry of summary judgment." Stephens v. City of Butler, Alabama, et al., 2007 WL 1834898 (S.D. Ala.)
(Doc 52, pg. 14)

# ISSUE I

## PLAINTIFF IS A "QUALIFIED INDIVIDUAL WITH A DISABILITY" UNDER THE ADA

The primary "genuine issue of material fact", the issue at the core of the debate, the one issue that must be decided before all others, And before Plaintiff can even proceed with this action, Remains in dispute. The Defendants claim:

**A. The plaintiff is not a "qualified individual with a disability."**
To qualify as a disability, an impairment must substantially limit with a major life activity. 42 U.S.C. s. 12102.   (Doc. 44, pg. 26) (as written)

## ARGUMENT—ISSUE I

Any one of Plaintiff's several medical conditions alone qualifies Plaintiff as a "qualified individual with a disability" for purposes of the Americans With Disabilities Act. When examined in the totality of the circumstances, no reasonable individual could seriously doubt that Plaintiff is disabled.

The facts of the case prove conclusively that Plaintiff is a "QUALIFIED INDIVIDUAL WITH A DISABILITY" UNDER THE ADA. THEREFORE, Judge Hinkle's Order granting Summary Judgment to Defendants is inappropriate Defendants have failed to prove that no genuine issue of material fact exists.

Defendants, by their own admission, have been proven wrong on the bedrock issue of Plaintiff's complaint. Based on the fact that Defendants have failed to prove

that: The plaintiff is not a "qualified individual with a disability." a reasonable jury could return a verdict for the non-movant.

Also, Based on the proven fact that: Plaintiff suffers from several medical conditions that "substantially limits one or more major life activities of such individual;" The plaintiff is a "qualified individual with a disability." As such, Plaintiff is entitled to the protections and provisions of the Americans With Disabilities Act, as well as the Eighth Amendment's protection from cruel and unusual punishments.

## MEMORANDUM OF LAW

### The Eighth Amendment to the Constitution of The United States provides:

Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." §12132 (2000 ed.). A " 'qualified individual with a disability' " is defined as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." §12131(2). The Act defines " 'public entity' " to include "any State or local government" and "any department, agency, ... or other instrumentality of a State," §12131(1). We have previously held that this term includes state prisons. See *Pennsylvania Dept. of Corrections* v. *Yeskey*, 524 U. S. 206, 210 (1998). Title II authorizes suits by private citizens for money damages against public entities that violate §12132. See 42 U. S. C. §12133 (incorporating by reference 29 U. S. C. §794a
Thus, insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity
*United States v. Georgia*, 546 U.S. 151, 159 (2006)

Plaintiff brought suit against Dr. Erlinda Perez and The Florida Department of Corrections claiming that Plaintiff's civil rights under the Americans With Disabilities Act and the Eighth Amendment to the Constitution of The United States were violated while Plaintiff was incarcerated in the care, custody and control of the Florida Department of Corrections. Plaintiff was incarcerated from March 1, 2007 to February 26, 2010.

In addition to Plaintiff's Complaint that Plaintiff was denied the benefits of the services, programs, or activities of a public entity, The Florida Department of Corrections (DOC), Initially by the actions of Dr. Erlinda Perez in refusing to provide Plaintiff proper medical treatment, and by refusing to prescribe Plaintiff's medically necessary, disability related auxiliary aids and services, in violation of the provisions of The Americans With Disabilities Act (ADA). And then later by the improper denial of Plaintiff's Complaints Plaintiff filed using the internal grievance procedure of the DOC. (Plaintiff was meticulous in making sure that each issue he raised was officially denied by the Secretary of the DOC). Plaintiff also addressed other Issues using the DOC internal grievance procedure: ADA requests for reasonable modification to the recreation yard, to make the recreation yard more accessible to disabled inmates; complaints of harassment by prison officials; the improper use of Plaintiff's disabilities to purposefully inflict unnecessary pain and suffering by refusal to honor "no prolonged standing" passes;

by otherwise forcing Plaintiff to stand or walk excessively; forcing Plaintiff to "take the long way around", mostly for the personal amusement of the guards; assigning extra duty, on the basis of being wheelchair disabled; confiscation of Plaintiff's legal records; setting Plaintiff up with a knife in his mattress, and then placing him in confinement in retaliation for writing grievances;

As a matter of record, each and every one of Plaintiff's Official complaints were denied, regardless of the merit of Plaintiff's complaint. Including Plaintiff's complaints of improper and inadequate medical care, which were callously ignored and routinely dismissed by DOC, ultimately even by the Secretary of the DOC.

## BASIS OF MEDICAL CLAIM

PLAINTIFF CONTENDS THAT AS A RESULT OF DR.PEREZ AND THE FLORIDA DEPARTMENT OF CORRECTIONS REFUSAL TO PROVIDE PLAINTIFF WITH PROPER MEDICAL CARE IN GENERAL, INCLUDING, HIS DISABILITY RELATED, MEDICALLY NECESSARY, AUXILIARY AIDS AND SERVICES, IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT (ADA), PLAINTIFF WAS FORCED TO ENDURE CRUEL AND UNUSUAL PUNISHMENT AND UNNECESSARY PAIN AND SUFFERING, BOTH PHYSICAL AND MENTAL.

PLAINTIFF FURTHER CONTENDS THAT THE DEFENDANT'S REFUSAL TO PROVIDE PROPER MEDICAL CARE IN GENERAL,

INCLUDING FAILURE TO PROVIDE EVEN PLAINTIFF'S NORMAL DAILY
MEDICATIONS MOST OF THE MONTH OF APRIL (PRECEEDING
PLAINTIFF'S KIDNEY FAILURE IN MAY) AND REFUSAL TO PROVIDE
PLAINTIFF'S DISABILITY RELATED MEDICALLY NECESSARY,
AUXILIARY AIDS AND SERVICES, A CPAP, A WHEELCHAIR AND
DIABETIC SHOES, AND THE ATTENDANT UNNECESSARY PAIN AND
SUFFERING, AND MENTAL AND PHYSICAL STRESS, WHEN COMBINED
WITH PLAINTIFF'S OTHER PHYSICAL IMPAIRMENTS, WHICH
INCLUDED DIABETES AND CHRONIC HYPERTENSION, CAUSED
PLAINTIFF'S ALREADY DAMAGED KIDNEYS TO FAIL ON MAY 22, 2007.

AS TO BE EXPECTED, DEFENDANTS DISAGREE, THEREFORE,
A GENUINE ISSUE OF MATERIAL FACT STILL EXISTS. REGARDING
THE REASONABLENESS OF THE TREATMENT PLAINTIFF RECEIVED
FROM DR. PEREZ AND THE DOC FOR HIS VARIOUS MEDICAL
DISABILITIES AND INFIRMATIES. [1]A FACTUAL DISPUTE SHOULD BE
RESOLVED BY "THE TRIER OF FACTS", THE JURY.

[1]"[F]actual disputes that are *material* preclude entry of summary judgment." Stephens v. City of
Butler, Alabama, et al., 2007 WL 1834898 (S.D. Ala.)

**DR. PEREZ USED APPROPRIATE PROFESSIONAL JUDGMENT WHEN DETERMINING
THAT THE PLAINTIFF DID NOT IMMEDIATELY NEED A CPAP MACHINE, A
WHEELCHAIR AND SPECIAL SHOES.**
**(Doc. 44, pg. 15)**

Dr. Perez examined Mr. Ganstine for more than an hour, carefully reviewing and documenting his medical condition. This was not a cursory examination or one exhibiting deliberate indifference. This was, instead, the very antithesis of deliberate indifference. The record establishes without dispute that Dr. Perez exercised her best medical judgment and treated Mr. Ganstine accordingly. (Doc. 61, pg. 6)  Judge Hinkle's Order

**Plaintiff contends the decision as to whether Plaintiff received proper medical treatment from Dr. Perez and the Department of Corrections should have been deliberated and made by a jury, after hearing the opposing arguments.**

## MEDICAL TREATMENT
## MEMORANDUM OF LAW

The government has an obligation to provide medical care for those it punishes by incarceration and cannot be deliberately indifferent to the medical needs of it's prisoners Estelle v. Gamble 429 U.S. 97 (1976)

For example, the appropriate inquiry when an inmate alleges that prison officials failed to attend to serious medical needs is whether the officials exhibited "deliberate indifference." See *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). This standard is appropriate because the State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns. *Whitley, supra,* 475 U.S., at 320, 106 S.Ct., at 1084-1085. Hudson V. McMillian 503 U.S. 1 (1992)

A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain". Gamble, 429 U.S. at 104, 97 S.Ct. at 291. Either result is not the type of "routine discomfort [that] is 'part of the penalty that criminal offenders pay for their offenses against society.' " Hudson, --- U.S. at ----, 112 S.Ct. at 1000 (quoting Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)). The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a "serious" need for medical treatment. See, e.g., Wood v. Housewright, 900 F.2d 1332, 1337-41 (9th Cir.1990) (citing cases); Hunt v. Dental Dept., 865 F.2d 198, 200-01 (9th Cir.1989). Mcgluckin v. Smith, 974 F2d 1050 (9th Cir. 1992)

The "[u]nnecessary and wanton infliction of pain" upon incarcerated individuals under color of law constitutes a violation of the Eighth Amendment and is actionable under 42 U.S.C. § 1983. Id. "Such indifference may be manifested in two ways. It may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." Hutchinson, 838 F.2d at 394. However, "[m]ere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights." Id. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment." Gamble, 429 U.S. at 106, 97 S.Ct. at 292. Mcgluckin v. Smith, 974 F2d 1050 (9th Cir. 1992)

The requirement of deliberate indifference is less stringent in cases involving a prisoner's medical needs than in other cases involving harm to incarcerated individuals because "[t]he State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns." Hudson, 503 U.S. at 1, <u>Mcgluckin v. Smith</u>, 974 F2d 1050 (9th Cir. 1992)

A defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established. <u>Mcgluckin v. Smith</u>, 974 F2d 1050 (9th Cir. 1992)

## ISSUE II-A
## GOUT

Defendants claim Dr. Perez properly treated Plaintiff's gout with medication and insoles for his shoes. Plaintiff avers insoles were not a reasonable treatment for gout. Putting a set of insoles in an already tight pair of shoes only served to make them tighter, and increased the Plaintiff's pain.

Plaintiff contends Dr. Perez's use of insoles to treat Plaintiff's gout was ineffective, and in fact served only to increase Plaintiff's pain. A material issue of fact exists as to the reasonableness of Dr. Perez's use of insoles to treat Plaintiff's gout remains to be addressed. Issues of fact should be decided by a Jury.

## ISSUE II-C
## DIABETES—HYPERTENSION

Defendants also acknowledge Dr. Perez treated Plaintiff for diabetes and hypertension which Defendant's claim were "urgent issues" that required immediate treatment, and follow-up care in "chronic clinics" which Dr. Perez scheduled.

Chronic clinics are periodic follow up appointments at the inmate's permanent facility, the place from which the inmate would go *within a week or two.* (Doc. 44, pg. 6)

## ISSUE II-D
## SLEEP APNEA
## FAILURE TO PROVIDE A C-PAP

Dr. Perez's assessment also indicates that Mr. Ganstine claimed a history of sleep apnea. She did not conclude that he in fact suffered from that condition, however. He presented no outside medical records verifying that condition (Doc. 44, pg.7)

Thus, the plaintiff presented no evidence to Dr. Perez that his condition had been diagnosed by a professional and it was not apparent that he had an *immediate* need for treatment.
Therefore, it was reasonable for her to conclude that she could defer to the plaintiff's primary care physician who would see him when he reached his permanent facility. In her experience, **the plaintiff would be transferred in only a week or two** and she had no reason to expect otherwise.
(Doc. 44, pg. 20)

Dr. Perez acknowledges only that Plaintiff claims a history of sleep

apnea.  Dr. Perez determined that since Plaintiff was not: "suffering from fatigue

or daytime sleepiness, or shortness of breath", did not bring any medical records

with him to DOC, "did not appear to be in any distress", and "my findings that he

was breathing well". "His Sleep apnea, assuming he suffered from such a

condition, did not present such an acute problem that I had to address it

immediately. "I concluded that it could wait until he reached his permanent

facility" **"within a week or two"** (Doc. 44-3, pg. 6)

*Dr. Perez did not fare well in her deposition: Her deposition testimony flatly*

*contradicts Mr. Vail's, as well as her own estimate of "within a week or two"*

pg. 10

```
22    A  And usually once they go to the West Unit,
23    where there are transferred to the permanent unit,
24    I don't know correctly how many days they have to
25    stay, but usually in a few weeks they are
1     transferred to their permanent facility.
```
(Perez Deposition pg. 30,31)

Nurse Sweat's deposition testimony also contradicts the estimate **of "within a week or two"** "inmates housed at RMC commonly remain for months before being moved to different facilities". (Exhibit 16, Sweat deposition, pgs. 37-38)

```
12    A  Okay.  By the history, they will be telling
13    -- the wife would be telling of snoring, things
14    like that, or they may have a problem with
15    sleeping.  (Perez Deposition pg. 15)
```

Dr. Perez's professional description of sleep apnea is: …. well, it is correct.

```
7     A  From the physical examination standpoint of
8     view, if his respiratory rate, the pulse rate and
9     the lungs are clear and the x-rays are clear, then
10    if I am thinking of sleep apnea, then this is the
11     process we do in the clinic, we just say:  History
12    of.
13    And then if the inmate is not in respiratory
14    distress and in my decision he can wait and be seen
15    at his permanent institution, then I don't refer him
16    to the pulmonologist.  (Perez Deposition pg.  16)
```

Dr. Perez explains her professional procedure for assessing sleep apnea.


## DR PATEL

The Defendants have secured the expert testimony of Dr. Dineash D. Patel.

According to Dr. Patel, his specialty is pulmonary and sleep medicine.

Although his declaration makes no mention of it, the fact is Dr. Patel has a contract to provide pulmonary treatments and examinations with the Florida Department of Corrections.

Dr. Patel received Plaintiff's records from The Assistant Attorney General's Office, and a list of questions to be answered. Dr. Patel's response to question 1 is particularly interesting:

Q1    Was Dr. Perez's decision to defer to the plaintiff's primary care physician at a later time than the initial screening action on the plaintiff's claim of sleep apnea and the need for a CPAP medically appropriate and supported by professional judgment?

A1    Dr. Patel I believe Dr. Perez's decision to defer the treatment and prescription for treatment of sleep apnea was justified **IF** Dr. Perez was waiting for records to confirm the diagnosis and treatment recommendations i.e. pressure settings for CPAP machine

The **IF** qualifies and defines Dr. Patel's approval. Dr. Perez, clearly was not: " waiting for records to confirm the diagnosis and treatment recommendations". Therefore, DR. Perez' action does not merit Dr. Patel's conditional approval. We also do not know if Dr. Patel was made aware of the length of time Plaintiff would have to go without the use of his CPAP, but it wasn't going to be **"within a week or two" as Defendants would like us to believe.**

Q2    Did Dr. Perez's decision subject the plaintiff to a substantial risk of serious harm?

A2    I feel the patient was at some risk for serious harm given Dr. Perez's decision not to initiate CPAP Therapy at the time of her evaluation.

Dr. Patel expresses his opinion that the delay in providing the CPAP did subject Plaintiff to risk of serious harm, and discusses some of the risks involved with not treating sleep apnea.

Q6    What are the effects of untreated sleep apnea?

A6    The serious medical effects of untreated sleep apnea include sudden cardiac death, myocardial infraction, cerebrovascular disease, cardiac arrhythmias, uncontrolled hypertension, poor cognitive performance during daytime due to sleep fragmentation, poor quality sleep, and excessive sleepiness during daytime. **As a result of Dr. Perez's refusal to provide Plaintiff's immediate medical need for treatment of his sleep apnea, it is apparent that plaintiff was indeed subjected to serious harm, even death from the delay in providing a CPAP. Considering the fact that Plaintiff had informed Dr. Perez of his sleep apnea, it was her duty to address the issue.  Dr. Perez's action defies justification.**

(—It must be a condition of urgency which, if not adequately treated, would produce death, degeneration or extreme pain.‖). In general, serious medical needs are those requiring *immediate* medical attention. *Youmans v. Gagnon*, 626 F.3d 557, 564 (11th Cir. 2010).

Dr. Patel also says: "From review of the records it appears patient suffered mainly anxiety related symptoms and panic attacks during sleep and poor quality sleep during night.

## SLEEP APNEA
## FAILURE TO PROVIDE CPAP
## CONCLUSION

Plaintiff contends DR. Perez cannot justify her failure to prescribe a CPAP to treat Plaintiff's sleep apnea: Plaintiff absolutely made Dr. Perez aware of his immediate need for a CPAP.  Plaintiff contends Dr. Perez simply wasn't going to give Plaintiff anything he asked for. Dr. Perez wasn't going to be told what to do by an inmate. Inmates didn't deserve decent medical treatment; they gave up that right when they committed their crime. Money spent to treat an inmate was wasted anyway. A very sad perspective, to be sure, but a very prevalent philosophy among those who work at DOC. Simply put, Plaintiff's arrogance in demanding his medical needs angered Dr. Perez. She wasn't going to give him anything.

In fact, Dr. Perez did nothing to address the issue of Plaintiff's need for a CPAP to treat his sleep apnea, although it was an issue which needed to be addressed immediately. Untreated sleep apnea is every bit as dangerous as the diabetes and hypertension, which Dr. Perez thought worthy of immediate treatment, and referral for follow-up check-ups, even more so; Even Defendant's own expert, Dr. Patel admits left untreated, sleep apnea can cause: sudden cardiac

death, myocardial infraction, cerebrovascular disease, cardiac arrhythmias,

uncontrolled hypertension, poor cognitive performance during daytime due to

sleep fragmentation, poor quality sleep, and excessive sleepiness during daytime.

(Patel Expert Witness Report, pg. 6)

Dr. Christopher agrees "There is an increased instance of heart attack and

stroke and cardiac arrhythmias"(Christopher Deposition pg. 20)

Strangely enough, both Doctors mention cardiac arrhythmias as a

consequence of untreated sleep apnea, test results on the day Dr. Perez

examined Plaintiff **records** *show EKG: ABNORMAL*.SEE: EXHIBIT

(Doc. 55-1, pg. 7)Evidentially, Dr. Perez ignored this warning sign when she

performed her examination.

Whatever Dr. Perez's reason was for not addressing Plaintiff's

immediate need for a CPAP, It simply wasn't good enough. Dr. Perez made

an unwarranted but deliberate and  informed decision not to issue Plaintiff a

CPAP, to treat his sleep apnea. Her decision left Plaintiff vulnerable for

medical complications, including death by heart attack.  Plaintiff was also

subjected to mental stress and anguish, and unnecessary pain and suffering caused

by lack of proper sleep. There can be no reason good enough to justify a trained

medical professional purposely not treating a patient in this manner. Dr. Perez

made no effort at all to treat Plaintiff's sleep apnea. She did not even schedule

follow up care. Obviously the opposing parties disagree on the issue of Dr.

Perez's failure to provide immediate CPAP therapy for Plaintiff's sleep apnea. The

proper forum to decide this issue is in a courtroom and in front of a Jury.

## ISSUE II-E
## BACK PAIN
## REFUSAL TO PROVIDE WHEELCHAIR

Defendants claim Dr. Perez's prescription of a walker for Plaintiff's

complaint of chronic and substantial back pain was appropriate treatment.  Plaintiff

contends this treatment was totally inadequate, and in fact, increased the pain

caused by the excessive walking and standing required daily by DOC.

Further, Plaintiff contends he was unnecessarily subjected to cruel and unusual

punishment as a result of Dr. Perez's failure to prescribe a wheelchair.

Plaintiff's persistent attempts to obtain a wheelchair by filing grievances thru the

DOC internal grievance procedure all came back denied.

Plaintiff was forced to do without a wheelchair from March 1, to July 20, 2007

Finally, on July 20, 2007, Plaintiff walked into Dr. Isra's office at RMC,

And told Dr. Isra that forcing Plaintiff to walk using the walker was killing

Plaintiff's back, and was therefore, cruel and unusual punishment, and that he

wasn't going to do it anymore, regardless of what the DOC did to him. Dr. Isra

issued Plaintiff a wheelchair.

Plaintiff also has suffered from chronic and substantial back pain since approximately 2006. This pain increased dramatically during his incarceration with DOC.  Currently Plaintiff remains in considerable daily pain.  For which Plaintiff's doctor prescribes hydrocodone, a narcotic pain medicine.       (Doc 52, pg. 3)

**Plaintiff told DR. Perez his back was killing him from walking and standing in lines He also told Dr. Perez he was physically unable to endure the amount of walking and standing that DOC demanded of him. And that every day the pain got worse. Plaintiff even skipped meals to avoid walking He realized by the time of that examination that he could not continue at DOC without a wheelchair.**

**(Doc. 52 pg. 5)**

Dr. Perez also diagnosed that Mr. Ganstine suffered from lower back pain. This diagnosis is based in part on Mr. Gainstine's oral complaint of pain. But an x-ray revealed a compression deformity of two of his vertebrae that could have been the source of his complaint. (Doc. 44, pg. 7)

**Plaintiff informed Dr. Perez that Plaintiff was not physically capable of enduring the excessive walking and standing required by DOC. Dr. Perez callously disregarded Plaintiff's serious medical need to avoid chronic and substantial back pain caused by excessive walking and standing. Dr. Perez told Plaintiff:,**

**"No wheelchair, walker."**   **(Doc. 1, pg. 4)**

The Defense:
The plaintiff does not have a serious medical need requiring a wheelchair. He did not use a wheelchair before entering prison, and he has not used one since his release. Plaintiff's deposition p. 9, 14.
Even if he had a serious medical need that might require a wheelchair, Dr. Perez evaluated his complaints of back pain. *She had a chance to see him walk* and concluded that he was not in sufficient discomfort to require a wheelchair p 21 (Doc. 44, pg. 21)

Judge Hinkle
Nor did Dr. Perez prescribe a wheelchair. But it is undisputed that Mr. Ganstine had not been using a wheelchair before he entered the Department, and did not use one on his release. It is undisputed that Mr. Ganstine could in fact walk, though only for a limited distance and with some difficulty. Dr. Perez *observed Mr. Ganstine walk* as part of the physical examination. Dr. Perez concluded that Mr. Ganstine needed a walker, not a wheelchair. The conclusion may have been correct—Mr. Ganstine's failure to use a wheelchair outside the Department provides some evidence of that—but at worst it was an error in medical judgment of a kind that, again, does not constitute deliberate indifference (Doc. 61, pg. 7)

Dr. Perez:

Dr. Perez is sure she had a chance **to observe Plaintiff walk** when he came into her examining room, and is sure she would have noticed a sufficient problem with Plaintiff's ambulation that may have required a wheelchair, and is sure she would have documented a problem with his walk in the record, assuming that she noticed a problem with Plaintiff's walk.(Doc. 44-3, pg. 5)  Even though she does not have an independent recollection of the examination and she doesn't see how she could be expected to remember Plaintiff, anyway.. (Doc 44-3, pg. 2,)

However, Dr. Perez does confirm Plaintiff's lower back pain. An x-ray taken at

RMC revealed The source of the complaint. (Doc 44-3, pg.5)

As a matter of fact, Plaintiff does not use a wheelchair on the outside, Plaintiff needs All the exercise he can get to treat his blood sugar problem, and to keep him alive and moving. Before his incarceration, Plaintiff was able to walk and exercise in moderate amounts. To help control his blood sugar, Plaintiff began an exercise regimen which included hunting, fishing and just moving around in general. Each day, Plaintiff would push himself to the maximum, in spite of the pain it caused. Plaintiff's Doctor recognized the benefits to Plaintiff's health that the regimen provided, and provided pain medicine. The Doctor knew Plaintiff did not abuse the pain medicine he gave him. The regimen resulted in better mobility for Plaintiff, and lowered blood sugars, still a bit high, but manageable. Plaintiff's back problems, and pain increased dramatically while he was incarcerated, because of the damage caused by being forced to walk and stand excessively using a walker.

Currently, although Plaintiff is taking Perkoset-hydrocodone for pain, Plaintiff is basically reduced to a sedentary life. Unable to get around, Plaintiff spends days at a time without even leaving the house, and Plaintiff's blood sugar is out of control.

Chronic and substantial pain indicates that a medical condition is serious. Mcgluckin v. Smith, 974 F2d 1050 (9th Cir. 1992)

Dr. Perez ignored Plaintiff's complaint of chronic and substantial back pain.

Instead of the wheelchair Plaintiff asked for, Dr. Perez issued Plaintiff a walker.

## ISSUE II-E
## BACK PAIN
## REFUSAL TO PROVIDE WHEELCHAIR
## CONCLUSION

Plaintiff was forced to use a wheelchair while under incarceration because of the physical demands placed upon him due to his incarceration. Plaintiff's disabilities prevented compliance with orders and directives of the DOC staff. Everyday activities required at prison were beyond the physical capabilities of the Plaintiff. The failure of DOC medical staff to provide Plaintiff a wheelchair, and the alternate use of a walker caused Plaintiff chronic and severe back pain (unnecessary pain and suffering).

Plaintiff's contention that this pain and suffering could have been avoided (at least in part) by the use of a wheelchair is supported by record proof that after being provided with a wheelchair, Plaintiff's pain did subside to a manageable level. Plaintiff further contends that refusal, or delay in providing, Plaintiff a wheelchair, a "medical adaptive device" under the ADA, violated Plaintiff's ADA by excluding Plaintiff from participation in the medical services of the Florida Department of Corrections. Plaintiff also contends he has suffered an increase in his normal daily back pain, and that the stress of being denied the use of a

wheelchair, forced to walk with only the assistance of a walker from March 2, 2007, to July 20, 2007, during his incarceration, caused increased and permanent damage to his (already damaged) back.

Plaintiff contends that the walker prescribed by Dr. Perez was inadequate to meet his needs. Using the walker actually caused Plaintiff additional pain and Plaintiff's arms hurt from using it.

Judge Hinkle stresses the fact that Plaintiff can walk in his ORDER GRANTING SUMMARY JUDGMENT. He further stresses the point that Plaintiff does not use a wheelchair on the outside. The reason Plaintiff does not use a wheelchair on the outside is simple. In order to live Plaintiff must get every bit of exercise he can stand to try to control his diabetes. Even with the help of his Doctor, who prescribes pain medicine, Plaintiff is hard pressed to withstand the daily pain he must endure, pain that was increased dramatically by the lack of proper medical care provided by Dr. Perez and the DOC.

Judge Hinkle also stresses that Dr. Perez concluded Plaintiff's pain was not serious enough to require a wheelchair by **watching Plaintiff walk**. This judgment is based on Dr. Perez's opinion that if she had noticed a problem with the way Plaintiff walked, she would have documented it in her record. (Doc. 44-3, pg. 5) This issue requires the determination of several material issues, does Plaintiff really have back pain? If he does, is Plaintiff's back pain severe enough to limit

Plaintiff's life functions, and therefore, a disability under the ADA?  Did Dr. Perez

properly treat Plaintiff's back pain? Was Dr. Perez's assumption that if she had

noticed a problem with Plaintiff's ambulation she would have documented it

correct? This question should be decided by a jury.

### ISSUE II-F
### DIABETIC SHOES
### FAILURE TO PROVIDE

Dr. Perez concluded Plaintiff had a history of gout, not that he had gout.

However she provided medication, and insoles. (Doc. 44-3, pg. 5)

Before his incarceration Plaintiff wore soft shoes and sandals.  Since his

incarceration, Plaintiff has had to obtain Diabetic shoes due to worsening of his

hammertoe, during and since his incarceration.

Plaintiff wore tennis shoes and sandals before incarceration. More specifically

good tennis shoes with arch support, and wide enough to accommodate his feet,

which are disfigured from gout and diabetes. (Plaintiff deposition pg. 17,18.19)

Plaintiff also told Dr. Perez he suffered from peripheral neuropathy,

in conjunction with loss of feeling in his feet.

SOFT SHOE PASS
The "soft shoe pass" means that the inmate may buy shoes from the canteen.

Not that he received the shoes.

The plaintiff obtained special soft shoes on July 20, 2007, which he had for the
remainder of his incarceration. Plaintiff's deposition 50-51.
(Doc. 44, pg. 9)

pg. 22

Plaintiff states for the record: the preceding paragraph is incorrect. DOC did not provide diabetic soft shoes to treat Plaintiff's disabling foot condition. ARNP Land did issue Plaintiff a "soft shoe pass" (see: Plaintiff's Deposition Pg. 51) the pass was only good at ACI.

## ISSUE II-F
## DIABETIC SHOES
## FAILURE TO PROVIDE
CONCLUSION

The set of insoles Dr. Perez prescribed to treat Plaintiff's foot problems caused by diabetes and gout proved  grossly inadequate to treat Plaintiff's disabling foot conditions. The shoe insoles made the already tight "bobos" even tighter, increasing the pain level, and making an already bad situation even worse. Dr. Perez's unwise decision to provide insoles instead of the diabetic shoes the Plaintiff needed resulted in further unnecessary damage to Plaintiff's feet. Both of the podiatrists Plaintiff has seen since his release have indicated that surgery will be needed to correct Plaintiff's hammertoe. (see attached EXHIBIT Dr. Zewig) Clearly, there remains a contested question of material facts to be decided.

## INADEQUATE MEDICAL CARE

An inmate may show deliberate indifference in a number of ways: (1) actual knowledge of a serious need for medical care, plus a failure to treat; (2) delay in treatment, potentially "even for a period of hours"; (3) "grossly inadequate care"; (4) "a decision to take an easier but less efficacious course of treatment; or (5) "medical care which is so cursory as to amount to no treatment at all. McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999

The knowledge of the need for medical care and intentional refusal to provide that care has consistently been held to surpass negligence and constitute deliberate indifference. Ancata v. Prison Health Services, 769 F.2d 700, 704 (11th Cir. 1985); Carswell v. Bay County, 854 F.2d 454, 457 (11th Cir. 1988)(sufficient evidence existed for jury to find deliberate indifference where prison medical staff treated some of plaintiff's health problems but ignored others).

The trier of fact may infer deliberate indifference when prison personnel ignore without explanation a prisoner's serious medical condition that is known or obvious to them. Thomas v. Town of Davie, 847 F.2d 771, 772-73 (11th Cir. 1988).

A medical need qualifies as serious so long as society would consider the risk associated with not treating the condition as "so grave that it violates contemporary standards of decency . . ." Helling v. McKinney, 509 U.S. 25, 36, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993).

While employing an alternate form of treatment for a medical condition does not amount to deliberate indifference, an outright refusal to provide any treatment does Dobbins v. Cummins, 2011 WL 2447705 at *11 (M.D. Ala. 2011).

an official's delay in providing treatment for serious medical needs - even for a period of hours - may constitute deliberate indifference. Harris v. Coweta County, 21 F.3d 388, 393-94 (11th Cir. 1994)

a prison official may not delay in providing medical treatment or provide grossly inadequate treatment, and cause a prisoner to needlessly suffer that pain resulting from his illness. McElligott, 182 F.3d at 1257.

Delays in medical treatment are actionable when the delay was objectively sufficiently serious, i.e. it must result in the denial of the minimal civilized measures of life's necessities. Farmer, 511 U.S. at 834

A complete denial of readily available treatment for a serious medical condition constitutes deliberate indifference. Harris v. Coweta County, 21 F.3d 388, 393 (11th Cir.1994)..

A serious medical condition exists when severe back pain occurs on a daily basis and prevents the plaintiff from walking normally. Parzyck v. Prison Health Services, 290 Fed. Appx. 289, 291 (11th Cir.2008).

# CONCLUSION-ISSUE II

Plaintiff would never have believed that part of his sentence is to be

subjected to lack of proper medical care, but legally, it is.

Thus, care provided need not be perfect —or even very good.‖ *Harris v. Thigpen*, 941 F.2d at 1510. Inmates are only constitutionally entitled to —minimally adequate care.‖ Id, at 1509. (Doc. 44, pg. 17)
(As quoted in Defendant's Motion for Summary Judgment)

On March 1, 2007, Plaintiff entered the custody of the Florida Department of Corrections. On March 6, 2007, Plaintiff was examined by Dr. Erlinda Perez at Reception and Medical Center, Lake Butler, Florida. Dr Perez treated Plaintiff's hypertension and diabetes and gout, and prescribed A & D ointment for his chapped hands and hydrocortisone cream for a rash on his leg. Dr. Perez refused to treat Plaintiff's sleep apnea, although Plaintiff insisted he needed a CPAP machine to treat the potentially deadly infirmity. Plaintiff's feet (chronically sore from effects of gout and diabetic neuropathy) were hurting from the shoes DOC issued called (bobos),  they were a cheap slip on tennis shoe. The bobos were made too tight to fit Plaintiff's damaged feet. However, Dr. Perez refused Plaintiff's request for diabetic soft shoes. Instead she issued a set of shoe insoles. Dr. Perez also refused to treat Plaintiff's ambulatory and back problems by prescribing a wheelchair, instead she issued Plaintiff a walker.

DR. Perez callously ignored the risks Plaintiff faced by her failure to treat Plaintiff's sleep apnea, by doing absolutely nothing at all, and the mental anguish and physical damages Plaintiff suffered from lack of proper sleep and panic attacks. DR. Perez prescribed shoe insoles for his diabetic neuropathy and gout, which only made Plaintiff's feet hurt worse by making his bobos even tighter,

aggravating his already bad foot conditions caused by gout and diabetes Finally,

Dr. Perez, although she was aware of Plaintiff's chronic and substantial back pain

refused to prescribe the wheelchair Plaintiff needed. Instead, Dr. Perez prescribed a

walker, which was totally inadequate to alleviate Plaintiff's pain. For Plaintiff, this

meant months of excruciating back pain caused by walking with the walker, pain

that became worse and worse until the day Plaintiff walked into Dr. Isra's office

and told Dr. Isra "give me a wheelchair or lock me up, I'm done"

I don't intend to suffer any more of this cruel and unusual punishment"

    Dr. Isra ordered the wheelchair.

Plaintiff immediately filed a series of grievances using the DOC internal grievance

process, which were just routinely denied. What amazed Plaintiff the most was the

uselessness of writing grievances to try to rectify the situation. Grievances were

just automatically denied, often for the silliest of reasons. The total apathy of the

DOC to the medical needs, or needs in general, of inmates is appalling.

Plaintiff also began a study of prisoner's medical rights, particularly in relation to

medical treatments and violations under the Americans With Disabilities Act.

It became apparent that the DOC paid very little attention to the rights of Disabled

prisoners to proper treatment for their disabilities. Upon information and belief:

The medical needs of prisoners is not a priority of the DOC. Prisoner's Medical

needs are more often denied on a basis of cost rather than the genuine need for

treatment. Prison doctors are much more willing to prescribe a 50 cent tube of

A & D Ointment (which ultimately ends up as ink for tattoos); than a $1500

CPAP, to treat a genuine potentially fatal condition.

Plaintiff did eventually get a CPAP, although he suffered a kidney failure in the

process, and was subjected to considerable risk which was made even worse

because Plaintiff was painfully aware of the risk. And Plaintiff did eventually get a

wheelchair. Plaintiff solved the soft shoe problem by buying shoes that were 2

sizes too large from the laundry man. (for a hunny bun)

Finally: The decision of whether Dr. Perez violated Plaintiff's civil rights under the

Eighth Amendment and the Americans With Disabilities Act is not a decision that

should be made by Summary Judgment.  Genuine issues of fact, and credibility

determinations, such as believability of witnesses, "can be made only after trial .

"In the summary judgment context [the court] must avoid weighing conflicting

evidence or making credibility determinations." And "[F]actual disputes that are

*material* preclude entry of summary judgment." The decisions that were made in

the ORDER GRANTING SUMMARY JUDGMENT should have been made by a

Jury, after the opposing parties have had ample opportunity to air the merit of their

argument, and after proper deliberation.

# ISSUE III

## ISSUE III-A
## ADA COMPLAINT-
## RECREATION YARD, GULF ANNEX

### 2. The plaintiff had adequate access to the restroom and to recreational programs at Gulf Annex

Sgt. Smith's declaration and the photos and documents accompanying it demonstrate that the plaintiff had access to the recreational yard restroom. There is room for a wheelchair in the restroom. **The slope up to the building is slight and easily negotiable and the sand in the yard was not deep enough to be a significant impediment to movement in a wheelchair**; even if this wasn't so, Mr. Ganstine had orderlies to push him wherever he wanted to go on the compound, or could ask officers to obtain help. Smith declaration p. 1-2; plaintiff's deposition p. 53-55. (Doc. 44 pg. 29)

Slight is not an accurate word to describe the slope inmates had to use to access the

restroom. Document 44-5, Pages 6 and 7 of 10 show the area where inmates were

required to line up to use the restroom facilities at Gulf Annex. The sidewalk was

off limits for inmates. The only access was up the hill to the right of the restroom

door (the door to the right on page 6). This is where inmates lined up to use the

restroom. The slope is fairly steep, and the sand is fairly deep, and has to be

replaced after every good rain (page 7 shows the hill on a good day). A wheelchair

handicapped person would have difficulty accessing the restroom even with the

help of an orderly.

**Orderlies.**

Mr. Ganstine admitted at his deposition that he was assigned orderlies who assisted him in getting wherever he wished to go. He said the orderlies were available "most of the time" and that there were "very, very few times" when he could not get to a destination. Mr. Ganstine said sometimes he pushed himself to a destination: "It took longer, but I'd get there." Ganstine Dep. 57, ECF No. 44-12 at 15. (Doc. 61, pg. 4)

```
12    A      I had an orderly or somebody, but very, very
13    few times that I had to go down there myself.
20    Q      But for the most part, were you able to get
21     where wanted to go with your orderlies?
22    A      Reasonably, but it was always a strain, you
23    know, to get where you wanted to go. Sometimes I'd just
24    push myself, It took longer, but I'd get there.  (Plaintiff's deposition pg. 57)
```

Plaintiff explains why he didn't have to go to the rec yard by himself:

```
12    A      I actually paid my orderlies to push me, kept
13    them happy.        (Plaintiff's deposition pg. 53)
```

## ISSUE III-A
## ADA COMPLAINT-
## RECREATION YARD, GULF ANNEX
## CONCLUSION

This judgment is based on the assumption that Plaintiff had no problem getting around the compound because DOC had solved the problem by providing Plaintiff with two orderlies who remained at Plaintiff's beck and call to take him wherever he wanted to go. This is partially true, as long as Plaintiff was able to pay them. The judgment also accepts Sgt. Smith's conclusion that the slope where inmates lined up for the restroom was "slight", and the sand in the yard was not deep

**enough to be a significant impediment to movement in a wheelchair,** and was based on some very selectively taken pictures of the rec yard. These are material facts, they remain disputed.

The decision should have been made by a Jury, after hearing both sides.

### ISSUE III-B
### ADA COMPLAINT
### -WELLNESS PROGRAM

The special recreation programs were held on the rec. yard. This meant getting an orderly that was willing to push Plaintiff to the rec yard. Plaintiff certainly wasn't going to pay someone to take him to wellness classes.

Anyway, why would, a wheelchair disabled inmate subject himself to the torture of trying to get to an exercise program that was held on the rec yard?

**Impaired inmate committee:**

(Doc. 44-8, pg. 4) shows Plaintiff was recommended for the wellness program.

It also shows Plaintiff "Requested Freshstart Smoking" (Program)

Which is strange, since Plaintiff quit smoking in 2002. (See: Exhibits, Spedale 6)

It would seem that based on the smoking issue, the veracity of the recommendation that Plaintiff join wellness might be questioned.

### ISSUE III-C
### ADA COMPLAINT
### USING PLAINTIFF'S PHYSICAL DISABILITY
### TO PUNISH PLAINTIFF
### CONCLUSION

The Defendant's color the mistreatment of Plaintiff by prison guards as only

"rude and nasty comments" "minor harassment". (taken out of context)

Q      Did you ever file any grievances about Mr. Mobley's treatment of you?
A      No. That was *minor harassment* compared to the other things that were
going on. That's just harassment. Unnecessary, but harassment just the same
(Plaintiff's Deposition Pg. 32, L13-17)

However, some guards used Plaintiff's physical infirmities to punish him by

making him to walk long distances with his walker or stand in line excessively,

causing Plaintiff unnecessary pain and suffering, and violating Plaintiff's ADA,

and his right to be free from cruel and unusual punishment under the 8th

Amendment to the Constitution of The United States.

The officers can literally do whatever they want to entertain themselves, and get

off scot free ,because the DOC will not assist in serving summons, or help in

locating these officers. While verbal harassment may not violate ADA, using

Plaintiff's infirmity to punish him does. This question should go to a jury.

### ISSUE III-C
### ADA COMPLAINT

### DISCRIMINATION IN WORK ASSIGNMENT
### CONCLUSION

When, Sgt. Foster assigned Plaintiff and three other wheelchair disabled inmates to

"dust" 7 to 3, five days a week. and insisted they work the whole shift, because

they were  "slower than the others", and  with "no stopping" (his words) he did

violate their rights under the ADA. The work assignments were clearly designed to

be punitive because Sgt. Foster required the disabled inmates to work much longer

than the other inmates. A lot more than *for an hour longer than the others.* , who

in fact, averaged working only 30 minutes or less a day. This was not a one day

affair, even though Lt. Weeks had said Plaintiff's complaint was justified, Sgt.

Foster continued the work assignments right up to mid-November when Plaintiff

was put in confinement. Obviously there is a disagreement of fact, best decided by

a jury.

### ISSUE III-D
### COMPLAINT
### VIOLATION OF FIRST AMENDMENT
### CONFISCATING PLAINTIFF'S LEGAL RECORDS
### CONCLUSION

In the sixth, the plaintiff claims that the sergeant confiscated notes that he
kept about his life in the prison system. (Doc. 44, pg. 2)

Sgt. Foster violated Plaintiff's First Amendment rights by confiscating Plaintiff's

legal notes and records.

Sgt. Billie Linton had been assigned to center gate, several times when Plaintiff

went to the law library Sgt. Linton stopped him at center gate, and read through his

legal papers (improperly), so he wrote her up, which only made her more

determined to read his notes. At some point, she told Sgt. Foster he had been

keeping notes, so Sgt. Foster shook him down.

The records confiscated by Sgt. Foster were more than mere notes about prison

life. The records, which were scribbled notations, dates, people, what happened,

which officer did it, what rights were violated, extended form Plaintiff's time at RMC right up to the present at Gulf Annex. These records were written on priority mail envelopes. Sgt. Foster correctly assumed that these notes could be quite damaging to officers involved, and the DOC. Plaintiff did not tell Sgt. Foster to destroy the notes. The notes were, in fact, Plaintiff's personal legal records, kept for the purpose of this action. Therefore, Sgt. Foster did not violate Plaintiff's ADA by taking the legal records. Sgt. Foster violated Plaintiff's rights under the First and Fourth Amendments.

He has no evidence other than his subjective belief that Sgt. Foster acted with discriminatory intent. Moreover, he admitted in deposition that Foster —didn't do that because I'm a disabled person.‖ Plaintiff's deposition p. 115.

Sgt. Foster denies any discriminatory intent. Foster declaration p. 1.

(Doc. 44, pg. 32)

Judge Hinkle does not speak to this issue in his order.

## ISSUE III-E

### COMPLAINT-RETALIATION
### PLAINTIFF WAS SET UP WITH A KNIFE
### AND PLACED IN CONFINEMENT
### CONCLUSION

Judge Hinkle does not address this issue in his order.

Finally, the plaintiff alleges that someone hid a knife in his mattress, for which he was disciplined and sent to confinement. Plaintiff's deposition pp. 115-117. However, he has no evidence of a discriminatory motive and he agreed that he

received the appropriate due process protections during his disciplinary hearing such as notice of the charges and the ability to present witnesses. Plaintiff's deposition p. 117. (Doc 44, pg. 14)

Sgt. Foster denies any involvement in the knife incident. Foster declaration p. 2. (Doc. 44, pg. 15)

Ms. Meyers from classification and Lt. Weeks had a kangaroo Court and sentenced the Plaintiff to 60 days confinement. Plaintiff appealed the decision, but was denied. Proof positive that Prison officials can amuse themselves with impunity.

## CONCLUSION;

The question in this action is: Does the Individual forfeit all of his rights as guaranteed by the Constitution of the United States of America and the Amendments to the Constitution, including his basic right to medical care, his right to be free from cruel and unusual punishment, and his right to due process when he is convicted of a crime and sent to prison?

And, after he is released from prison, does that Individual have the right to challenge the violation of his rights while incarcerated in an impartial forum where the parties have proper opportunity to air their arguments in front of a Jury, which will then deliberate the merit of each party's argument  and render a decision?

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in

Frap 32 (A)(7)(B). This brief contains 8,611 words.

UNDER PENALTY OF PERJURY, I hereby declare that I have read the foregoing 35 pages, and the facts stated therein are true and correct,    Section 92.525(2); Florida Statutes (1999).

Stephen Fredric Ganstine
2417 Country Pines Ln.
Marianna, Florida 32448
January 25,  2012

## CERTIFICATE OF SERVICE

I hereby certify that on January 25, 2012, A true and correct copy of the foregoing **MOTION TO ALTER OR AMEND JUDGMENT** with first class postage prepaid, has been  deposited in the U.S. Mail at_Marianna, Florida, and properly addressed to the persons whose names and addresses are listed below:

JASON VAIL
Assistant Attorney General
Office of the Attorney General
PL-01
The Capitol
Tallahassee, FL 32399

_____  1 - 25 - 2012
Stephen Fredric Ganstine        date
2417 Country Pines Ln.
Marianna, Florida 32448

# EXHIBITS

# NEW PROBLEM EVALUATION SHEET

NAME _Stephen Constine_ DATE _11/2/11_

CHIEF COMPLAINT _diabetic pt c peripheral neuropathy mostly of R foot, plan surface. He doesn't feel the floor when he descends the stair_

ADDITIONAL PROBLEM (S) _____

ONSET [X] Gradual   [ ] Sudden   _____ years ___ months ___ weeks ___ days ago

Is pain intensity [X] getting worse [ ] the same as when problem started [ ] lessening?
_over past 5 years_

Accident or injury caused the problem ___ yes [X] no Was it at work ___ yes ___ no Date_____

PAIN SEVERITY [ ] Mild   [ ] Moderate   [ ] Severe   Episode(s)# _____

Has patient been treated by another doctor? ___ no ___ yes doctor_____

TYPE Of PAIN [ ] burning [ ] throbbing [ ] dull ache [ ] shooting

[ ] sharp [ ] tingling [ ] numbness [ ] hard to describe

WHEN PAINFUL [ ] worse at start, less as ambulating continues, ↑ again by end of day
(post static dyskinesis)
_intermittent_ [ ] before ambulating [ ] during sports [ ] constantly
_longer he walks_ [ ] after ambulating [ ] at night [ ] worse while standing
_↑ the R > L foot pain_ [ ] during ambulating [ ] without shoes [ ] with shoes

Does pain travel from the lower back down the buttocks and lower legs? ___ yes [X] no

Patient has noticed: redness ___ edema ___ fever ___ rash ___ of the foot or ankle

Does Patient smoke [X] no ___ yes _____ packs/ day, consume > than 2 alcoholic drinks/day ___ yes [X] no

Does Patient walk barefoot a lot at home? [X] yes ___ no Does pain interrupt sleep? ___ yes ___ no

Does anyone else in the family have these symptoms? ___ yes ___ no

Does pain interrupt sleep? ___ yes ___ no

Is pain less on days patient does not work? ___ yes ___ no



Right Foot  Left Foot

lses      DP _____ L _____ R          weak  weak

PT _____ L _____ R          weak  weak

llux Valgus: _mild_ L _moderate_ R

Pes Planus: _MD_ L _MD_ R

immetoes:   L  1  2  3  4  5      R  1  2  3  4  5

inionettes: _____ yes  ⨉ no          Mulder's sign: _____ M.I  L _____ M.I

int Range of Motion:   **1**=Painful      **2**=Restricted      **3**=Full

| | |
|---|---|
| _____ L Ankle | _____ R Ankle |
| _____ L S.T.J. | _____ R S.T.J |
| _____ L M.T.J. | _____ R M.T.J |
| _____ L 1st M.P.J. | _____ R 1st M.P.J. |
| _____ L lesser M.P.J.'s | _____ R lesser M.P.J.'s _____ ALL within normal lim |

.uscle Strength          LEFT FOOT          RIGHT FOOT

| | | | |
|---|---|---|---|
| Inverters | ____ good ____ weak | ____ good ____ weak | |
| Everters | ____ good ____ weak | ____ good ____ weak | |
| Plantarflexors | ____ good ____ weak | ____ good ____ weak | |
| Dorsiflexors | ____ good ____ weak | ____ good ____ weak | |

y. Flaky skin ____ ____ left ____ ____ right          has onychomycos

**PROGRESS NOTES**

| Last Name | First Name | Attending Physician | 1785 East Main Street |
|---|---|---|---|
| Gunshire | Stephen | STEFAN ZWEIG, D.P.M. | Dothan, Alabama 36301 |

| Date | Notes Should Be Signed by Physician |
|---|---|
| 11/2/11 | Has taken insulin for about 40 years + pills for about 10 yrs before that. Dr. Pratt has treated his past acute gout attacks. He saw a "blister" on tip of ℝ 3rd toe 3 months ago that healed a month later. 2 months ago he had a "blister" form on dorsum of ℝ 3rd toe's DIPJ that took 3 weeks to heal. Has an appt to see a nephrologist 11/15/11. Has been diabetic 50 yrs. Did a Semmes Weinstein test of Ⓑ feet. He felt the 10 gram more ½ of the time. Most toes had numbness. AP + lateral ℝ foot x-ray's were taken here today. The lateral view shows talonavicular, navicuneiform + cuneiform - tarsal joint spurring. AP view |

Notes Should Be Signed by Physician

There is an erosion of the navicula
near the 1st cuneiform. Note
degenerative spurring of calcan-
eocuboid joint. Note misalignment
of the phalanges of the 2nd, 3rd, 4th,
& 5th toes.

I wrote an Rx for extra depth (DME)
shoes. I wrote an Rx for Metanx
& B1 D3 for nerve health. I offe-
red him a bottle of Cryo Derm but
he declined to purchase it to use on his pa-

J. Zweig, DPM

**INTERNAL MEDICINE ASSOCIATES OF DOTHAN, P.A.**
**210 WESTSIDE DRIVE**
**DOTHAN, AL  36303**
**PHONE: (334) 793-5074**
**FAX: (334) 793-6460**

## OFFICE VISIT

| | |
|---|---|
| NAME:   STEPHEN GANSTINE | CHART  #:   39064 |
| DATE:   03-09-10 | DOB:  06-12-49 |

Mr. Ganstine is back over 3 years from his last appointment after being incarcerated. His diabetes is remarkably well controlled with an A1c of 6.6. He is on 20-30 units of 70/30 insulin twice a day p.r.n. He has not been using his sleep mask because in jail there was difficulty to get it to him. His blood pressure has been well controlled. He has had some dyspnea with exertion. He has a great deal of problems with his arthritis. For the last 3 years he has only been given Motrin and he requests to get back on his Darvocet. There is no point tenderness in his back. He does have a longstanding history of tobacco. He currently has a 6-month waiting period until he can get his Medicare. He is 60 years old and we do not have a guaiac stool over the last 3 years.

PMSH:   1.  Gout.  2.  Hypertension.  3.  Insulin dependent diabetes.  4.  Chronic obstructive pulmonary disease with suspected emphysema.  5.  Allergic rhinitis.  6.  Obstructive sleep apnea.  7.  Degenerative arthritis of the lumbar spine. X-rays 2007 showing L2, L3, L4, L5 degenerative disease.  8.  Questionable osteoporosis, T10-T12 compression fractures on x-rays. 9.  Splenic granuloma 2007. CT scan of the abdomen and pelvis with hiatal hernia, left kidney cyst and bilateral hilar nodes and mediastinal nodes were noted.  10.  BPH.  11.  Nephrolithiasis previously followed by Dr. Vukovich.  12.  GERD.  13.  Hyperlipidemia.  14.  60-pack-year of tobacco, quit 2002.  15.  Chronic kidney disease, stage iii. Creatinine up to 1.8.

**ALLERGIES AND INTOLERANCES:   PENICILLIN.**

MEDICATIONS:   Allopurinol 100 mg 2 daily, atenolol 100 daily-start today, enalapril 20 mg daily, insulin 70/30 25 units twice a day, Advair 115/21 twice a day-sample given, Nasonex daily, C-Flex daily, Darvocet-N 100 twice a day p.r.n., tizanidine 2-4 mg p.r.n. back pain.

ROS:  Significant for myalgias, back pain, diabetes, hypertension, normal left heart cath in the past by Dr. Brooks. Tobacco abuse with COPD and reactive airways disease in the past. Insulin dependent diabetes as well as hyperlipidemia.

Roland Spedale, M.D./mca

PAGE I



FLORIDA DEPARTMENT OF CORRECTIONS
OFFICE OF HEALTH SERVICES

# IMPAIRED INMATE MANAGEMENT AND SERVICE WORK SHEET

Check one: Services __✓__    Release Planning _____

Attach the most recent progress review or report.

(See Instructions on reverse side)

1. Inmate Name/DC # __Cranstine, Stephen__

2. Assistance and Status (enter Current, Suspended, Pending, Ineligible, None)
   Veteran _____ SSN _345 42519/SSI_____ Agency (specify)_____

3. Institutional Adjustment: Above Average __✓__ Average _____ Below Average _____ Poor _____

4. Management Needs (briefly describe each problem. None is no problem in area):
   a. Comprehensive Adjustment: __none__
   b. Behavioral Management: __none__
   c. Staff Supervision/Assistance: __none__
   d. Inmate Relationships: __Protect vic. from another Inmate @ Jacks__
   e. Security: __none__
   f. Housing: __none__
   g. Duty and Performance Evaluation: __none__

5. Current and prior program participation and status for each (completed, participating, withdrew):
   a. Highest Academic Level __Tabx test 12.9__
   b. Vocational (list courses) __none__
   c. Counseling and Self-Improvement (list) __none__
   d. Housing __R1-1125__
   e. Duty __Houseman__
   f. Programs __Requested FreshStart Smoking__

6. Recommendation: __Currently in the infirmary.__
   __Wellness program__

Prepared by (Name and Position): __PCapeno__
Location: __Gulf Annex__                    Date: __11-26-07__

Inmate Name __Cranstine, Stephen__
DC# __128841__    Race/Sex __W/M__
Date of Birth __6-12-49__
Institution __Gulf Annex__

This form is not to be amended, revised, or altered without
approval of the Deputy Director of Health Services
Administration

DC4-691 (3/01) Page 1 of 2

IADR053
(707)

State of Florida
Department of Corrections
**INITIAL PHYSICAL EXAM**
Exam Date: 03/06/2007 Start Time: 14:10 End Time: 15:17

Printed
03/06/2007

Provider: PE92 = PEREZ, ERLINDA

**INMATE NAME: GANSTINE, STEPHEN**          DC#: 0-128841  Cls.Team: 11
    Received: 03/02/2007   County: GADSDEN      Rec.Ctr: R.M.C. - MAIN UNIT
    Race: WHITE    Sex: MALE     Date of Birth: 06/12/1949   Age: 57
    Birthplace: City: SALEM              State: IL   Country: UNITED STATES
    Occupation: BUILDING CONSTRUCTIO   Religion: PROTESTANT
    Education Grade Level: 12    Marital Status: DIVORCED

**MEASUREMENTS AND OTHER FINDINGS:**
    Height: 5' 06"   Hair: BLONDE     Eyes: BLUE
    Build: OBESE          Glasses: Yes   Contact Lens: No
    Vision: Right: 20/ 0  Corr.to: 20/ 30   Left: 20/  0  Corr.to: 20/ 30
    Temp: 097.8F   Pulse: 99   Resp: 18   BP: 138/071   Weight: 260 lbs

**MEDICAL HISTORY (Subjective):**
    Old Medical Record Review . . . . . . . . . :
        NEW COMMITMENT
    General (History of Present Illness) . . . . . :
        GENERAL HEALTH: 57 Y/O WM IN NAD FOR IPE/CC: HTN/EC: DM T1
        PSA: WNL
        CBC: WNL
        UA: 250 MG GLUC/300 MG PROT./SMALL BILIRUBIN/LARGE BLOOD
        HIV STATUS: UNKNOWN
        CHEST X-RAY: LUNGS ARE CLEAR
        EKG: ABNORMAL
        RPR:  NR
        PPD: 00MM        AP:      ALT:      AST:
        ASTHMA:    LAST RX USED 2 YRS ? ALBUERTOL
        PEAK FLOW: 99 %
        HEART:   HEART CATH 5 YRS AGO DUE TO CHEST PAIN
        HIGH BLOOD PRESSURE:  DX 30 YRS AGO
        DIABETES:    DX 8 YRS AGO
        HX GOUT
        HX HIGH CHOL.
        SOB  APNEA LAST USED C PAP MACHINE 3/1/07 DID NOT BRING WITH
        HIM TODAY
        NO TB SYMPTOMS
        HX GERD
    Past Major Medical/Surgery HX . . . . . . . :
        '04 L KNEE SURGERY FOR REMOVAL OF TOPHI
        '03 L ELBOW INFECTION; REMOVAL OF TOPHI
    Psychological HX . . . . . . . . . . . . . : NO COMMENTS
    Family HX: . . . . . . . . . . . . . . . . :
        CHRONIC ILLNESS:   CANCER MOTHER    DECEASED
    Social HX (Tobacco, Drugs, Sexual, PPD, STD) :
        SEE DC4 707
        LOCATION:    RMC

7